**VANGUARD INTERSTATE TOURS, INC., Petitioner,**

v.

**INTERSTATE COMMERCE COMMIS-SION and United States of America, Respondents.**

No. 83–1671.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 10, 1984.

Decided May 18, 1984.

As Amended June 13, 1984.

Jeremy Kahn, Washington, D.C., for petitioner.

Evelyn G. Kitay, Atty., I.C.C., Washington, D.C., with whom John Broadley, Gen. Counsel, and Lawrence H. Richmond, Deputy Associate Gen. Counsel, I.C.C., and Robert B. Nicholson and Andrea Limmer, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondents.

Before WRIGHT and SCALIA, Circuit Judges, and MacKINNON, Senior Circuit Judge.

Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.

J. SKELLY WRIGHT, Circuit Judge:

This case involves the scope of a motor carrier's statutory right to intervene in Interstate Commerce Commission route application proceedings under the Bus Regulatory Reform Act of 1982 (BRRA), 49 U.S.C.A. § 10922(c) (1983). The sole issue in this case is whether the Commission may limit intervention in such proceedings to motor carriers possessing *permanent* authority to serve the routes for which a new carrier seeks competing authority. Resolu-

tion of this question depends on the interpretation given the statutory language "[n]o motor common carrier of passengers may protest an application to provide transportation * * * unless * * * it possesses authority to handle, in whole or in part, the traffic for which authority is applied[.]" 49 U.S.C.A. § 10922(c)(7)(A)(i). We hold that the Commission cannot, consistently with the intent of Congress, interpret these words as limiting intervention to carriers possessing permanent authority. We therefore reverse the Commission's decision to deny Vanguard Interstate Tours the right to intervene to challenge the application of a competing carrier, Mt. Kisco Bus Lines, for routes over which Vanguard had a form of *temporary* authority at the time the competitor's application was filed. This *holding* requires us to vacate the Commission decision awarding Mt. Kisco permanent authority for certain routes, and to remand for new proceedings in which Vanguard may intervene to protest Mt. Kisco's application.

## I. BACKGROUND

Vanguard Interstate Tours and Mt. Kisco Bus Lines are two motor common carriers that provide commuter bus service in Westchester County, New York. The present case grows out of their efforts to obtain authority from the Commission to serve particular commuter routes between Westchester County and New York City. In late 1982 and early 1983 both carriers sought authority for virtually identical routes that serve towns in eastern Westchester County including White Plains, Lewisboro, and Armonk, New York. A Commission grant of authority for a given route is not necessarily exclusive; Vanguard and Mt. Kisco, in other words, could both obtain authority to serve identical routes. When one carrier possesses, or has applied for, authority over a particular route, however, that carrier may have a

statutory right to protest—as inconsistent with the public interest—the other carrier's application for concurrent authority to serve the same route. *See* 49 U.S.C.A. § 10922(c)(7). It is the scope of Vanguard's statutory right of intervention to protest Mt. Kisco's application that is at the heart of this controversy. To grasp the precise legal point at issue here a thorough understanding of the facts is necessary.

As of October 1, 1982, neither Vanguard nor Mt. Kisco nor any other motor common carrier was serving the routes in question. On October 9th of that year Vanguard applied for two types of preliminary authority to serve the routes: "emergency temporary authority" and "temporary authority." The Commission grants "emergency temporary authority" to a carrier "to provide transportation to a place or in an area having no motor carrier capable of meeting the immediate needs of the place or area if the Commission determines that, due to emergency conditions, there is not sufficient time" to undertake the lengthier process of evaluating an application for temporary authority. 49 U.S.C.A. § 10928(c) (1983). Grants of emergency temporary authority last 30 days, and applications for such authority must be acted upon within 15 days of filing. *See id.* The Commission grants "temporary authority" to a carrier "to provide transportation to a place or in an area having no motor carrier capable of meeting the immediate needs of the place or area." Grants of temporary authority last 270 days, and applications for such authority must be acted upon within 90 days of filing. *See id.* § 10928(b).

Though a grant of temporary authority "does not establish a presumption that permanent authority to provide transportation will be granted," *id.* § 10928(b)(1), neither does it impede the eventual grant of permanent authority if a carrier can meet fitness requirements.[1] Carriers often apply for

---

**1.** To obtain a grant of authority a carrier must show itself "fit, willing and able" to serve the requested route. 49 U.S.C.A. § 10922(c)(1) (1983). The statutory language of § 10928(b)(1) quoted in text was undoubtedly intended to make clear that a grant of temporary authority in no way diminished the fitness showing that

these grants of temporary authority with the intent and expectation that they will mature into grants of permanent authority. Commission regulations accommodate and encourage this process. When a carrier files an application for "temporary authority" within 15 days of having filed an application for "emergency temporary authority," the initial 30-day grant of "emergency temporary authority" may be extended until the application for "temporary authority" is disposed of. 49 C.F.R. § 1162.2(d)(2) (1983). Similarly, a grant of "temporary authority" may be extended beyond the 270-day limit until a carrier's application for permanent authority is disposed of. *Id.* § 1163.1(a). The statutory procedure of granting authority in three stages facilitates immediate service to communities in need while the Commission undertakes the somewhat lengthy process of determining a carrier's fitness to receive permanent authority over a route. *See Gamble v. ICC,* 636 F.2d 1101, 1103 (5th Cir.1981).

In the present case the Commission granted Vanguard "emergency temporary authority" effective November 1, 1982, and Vanguard began service on that date. On December 9th the Commission granted Vanguard "temporary authority." Between these two dates, however, Mt. Kisco made an application for permanent authority to serve the routes that Vanguard was then serving under the grant of "emergency temporary authority." On January 8, 1983 Vanguard also applied for permanent authority over the routes. Eventually both carriers would receive permanent authority. But Vanguard sought, and was denied, the right to intervene in Commission proceedings in early 1983 to challenge Mt.

Kisco's application. Vanguard now claims that this denial of intervention violated the terms of BRRA and thus requires that the grant of permanent authority to Mt. Kisco be vacated.

The dispute between Vanguard and the Commission centers on the proper interpretation of Section 6 of BRRA, 49 U.S.C.A. § 10922(c), which governs both awards of permanent authority and rights of intervention to challenge applications for such authority. Essentially, Section 6 establishes two avenues for applicants: "fitness only" applications and "public interest" applications. "Fitness only" applications are made for authority to serve on a route on which no other carrier is operating. Subsection (c)(4) governs "fitness only" applications, *id.* § 10922(c)(4); to receive authority under this subsection the applicant must show it is "fit, willing and able" to serve the requested route. *Id.* § 10922(a)(1). No further public interest inquiry is made under this subsection. "Public interest" applications pertain to routes already served by another carrier. Subsection (c)(1) governs these applications; the applicant must show fitness to serve the route, but a protestant can attempt to show that grant of the application will not be in the public interest. *See id.* § 10922(c)(1). Subsection (c)(3) guides the Commission in making "public interest" determinations, and indicates that a route application should generally be denied for "public interest" reasons only when the benefits of increased competition are outweighed by threatened reductions in overall service to the community as a result of competition.[2] If the protestant carries the

an applicant had to make to obtain a grant of permanent authority.

**2.** Subsection (c)(3) reads:

(3) In making any findings relating to public interest under paragraphs (1)(A) and (2)(B) of this subsection, the Commission shall consider, to the extent applicable—

(A) the transportation policy of section 10101(a) of this title;

(B) the value of competition to the traveling and shipping public;

(C) the effect of issuance of the certificate on motor carrier of passenger service to small communities; and

(D) whether issuance of the certificate would impair the ability of any other motor common carrier of passengers to provide a substantial portion of the regular-route passenger service which such carrier provides over its entire regular-route system; except that diversion of revenue or traffic from a motor common carrier of passengers in and of itself shall not be sufficient to support a finding that issuance of the certificate would

burden of persuasion on the public interest issue, the Commission will reject the application.

Subsection (c)(7) sets forth the criteria that a potential protestant must meet to be permitted to intervene to challenge a route application on public interest grounds. It reads:

(7) No motor common carrier of passengers may protest an application to provide transportation filed under this subsection or a request to remove an operating restriction under section 10922(i)(4) of this title unless—

(A)(i) it possesses authority to handle, in whole or in part, the traffic for which authority is applied;

(ii) it is willing and able to provide service that meets the reasonable needs of the traveling public; and

(iii) it has performed service within the scope of the application during the previous 12-month period or has, actively in good faith, solicited service within the scope of the application during such period;

(B) it has pending before the Commission an application filed prior in time to the application being considered for substantially the same traffic; or

(C) the Commission grants leave to intervene upon a showing of other interests that are not contrary to the transportation policy set forth in section 10101(a) of this title.

49 U.S.C.A. § 10922(c)(7). Thus BRRA limits intervention as of right to carriers that already serve routes for which a new carrier seeks authority and to carriers with an application pending for authority to serve routes for which a new carrier seeks authority.

Originally Mt. Kisco made a "fitness only" application for authority to serve the routes in question. See Application of Mt. Kisco, Joint Appendix (JA) 4. At the time of making this application Mt. Kisco thought that no other carrier was serving the routes for which it applied. See Item III Attachment to Application of Mt. Kisco, JA 7. On December 7, 1982 Mt. Kisco notified the Commission by letter that its application should be viewed not as a "fitness only" request but as a "public interest" request. See Letter of Sidney J. Leshin, December 7, 1982, Addendum B to brief for respondents. Though this letter does not explicitly acknowledge that the requested routes were already served by Vanguard, Mt. Kisco could only have been motivated to amend its application by the knowledge that the routes were served by some other carrier. Notice of Mt. Kisco's competing application appeared in the Federal Register on December 29, 1982. See 47 Fed.Reg. 58057 (1982). It was listed among those applying for "public interest" authority.

The notice prompted Vanguard to contest Mt. Kisco's application. As a first step Vanguard requested from Mt. Kisco a copy of its application. Apparently Mt. Kisco sent Vanguard a copy of the original "fitness only" application, but neglected to send a copy of the December 7th letter amending the application to one for a "public interest" determination. Acting on this incomplete and thus misleading information, Vanguard sought to intervene in the Commission proceedings to protest Mt. Kisco's application. Vanguard protested on the ground that Mt. Kisco could not receive "fitness only" consideration under subsection (c)(4) because Vanguard was already serving the requested routes and therefore the Commission should apply the "public interest" standard of subsection (c)(1). In other words, Vanguard claimed the statutory right to an opportunity to show that the grant to Mt. Kisco would disserve the public interest. See Protest of Vanguard Interstate Tours, In re Mt. Kisco Bus Lines, Inc., JA 13.

In April 1983 a review board in the Commission granted Mt. Kisco's request for permanent authority and rejected Van-

---

impair the ability of the carrier to provide a substantial portion of the regular-route passenger service which the carrier provides over its entire regular-route system.

guard's protest. *See* Interstate Commerce Commission Decision No. MC–127300 (Sub-No. 3) (1983) (*Review Board Decision*), JA 25. Though admitting that Vanguard might have been misled by Mt. Kisco's failure to provide complete and accurate information, the board found that Vanguard suffered no prejudice because Vanguard was "unqualified to protest this application on a public interest basis." *Review Board Decision* at 1, JA 25. The review board interpreted the section of BRRA governing intervention in Commission route proceedings, 49 U.S.C.A. § 10922(c)(7), as not granting Vanguard a statutory right to intervene. On this basis, the board treated Mt. Kisco's application as if it were unopposed on public interest grounds and granted the requested authority because Mt. Kisco had shown itself fit, willing and able to serve the requested routes. *Review Board Decision* at 1, JA 25. Vanguard appealed this decision within the agency but was unsuccessful. Interstate Commerce Commission Decision No. MC–127300 (Sub-No. 3) (June 10, 1983) (*Appellate Division Decision*), JA 28; Interstate Commerce Decision No. MC–127300 (Sub-No. 3) (July 11, 1983) (*Commission Decision*), JA 31.

In essence, the Commission held that the BRRA provision governing intervention to challenge route applications, 49 U.S.C.A. § 10922(c)(7), gave Vanguard no right to protest Mt. Kisco's application. That section, as noted above, grants intervention as of right to a carrier if that carrier possesses authority to serve the route for which a new carrier seeks competing authority, is fit to serve the route, and has in fact served the route in the 12 months preced-ing the new carrier's application. 49 U.S.C.A. § 10922(c)(7)(A).[3] Vanguard indisputably met the second and third conditions: it was fit to serve the routes and had served them in the 12-month period prior to Mt. Kisco's application. The Commission found, however, that Vanguard could not meet the first condition. The rationale for this view was expressed most directly in the decision of the appellate division: "The rules [implementing subsection (c)(7)(A)] clearly are concerned with permanent authority, and the fact that protestant [Vanguard] held temporary authority at the time it opposed the application did not render it a qualified protestant." *Appellate Division Decision* at 1, JA 28.

Thus the Commission interpreted the statutory language "authority to handle" in subsection (c)(7)(A)(i) as limiting intervention to carriers possessing *permanent* authority over a route at the time of a competing application for authority, and excluded Vanguard on this basis.

## II. ANALYSIS

■ Vanguard argues that the Commission's decision to exclude it from the Mt. Kisco proceeding resulted from an impermissibly narrow reading of subsection (c)(7)(A). The sole issue before us is whether the Commission can permissibly read the language "[n]o motor common carrier of passengers may protest an application to provide transportation * * * unless * * * it possesses authority to handle, in whole or in part, the traffic for which authority is applied," as limiting intervention in route application proceedings to competing carriers possessing permanent authority over requested routes.[4]

The Commission never considered whether Vanguard should have been granted permissive intervention as a carrier that had made "a showing of other interests that are not contrary to the transportation policy set forth in section 10101(a) of this title." Because we find that Vanguard should have been granted intervention as of right, we do not consider whether the Commission's failure to consider permissive intervention was arbitrary and capricious.

**3.** The section also grants intervention as of right to a carrier that has pending before the Commission an application for authority to serve the route for which a new carrier seeks authority. 49 U.S.C.A. § 10922(c)(7)(B). Because Mt. Kisco's application for permanent authority antedated Vanguard's—and subsection (c)(7)(B) thus would not provide a basis for intervention—Vanguard's statutory right to intervene depended on whether it met the three conditions of subsection (c)(7)(A).

**4.** At oral argument the Commission raised the argument that Vanguard should be denied

The Commission has cast this issue in terms of judicial deference to agency interpretations of their governing statutes. *See FEC v. Democratic Senatorial Campaign Committee*, 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981). On this view, we must accept the Commission's narrow reading of "authority" because it is the interpretation of the agency charged with administering the statutory scheme. In support the Commission cites, *inter alia, National Wildlife Federation v. Gorsuch*, 693 F.2d 156 (D.C.Cir.1982), for the proposition that we must defer to an agency interpretation if it is reasonable. This demand of deference is, however, insufficiently sensitive to the salient differences among situations in which a reviewing court must evaluate an agency interpretation of its governing statute.

■ *National Wildlife Federation, supra*, makes this point clear. As the court noted, "[D]eference is ultimately a function of Congress' intent." 693 F.2d at 167 (internal quotations and citations omitted); *accord Process Gas Consumers Group v. U.S. Dep't of Agriculture*, 694 F.2d 778, 791 (D.C.Cir.1982) (*en banc*), *cert. denied*, — U.S. —, 103 S.Ct. 1874, 76 L.Ed.2d 807 (1983). When Congress' intent is to delegate to the agency the task of supplying the meaning of the statutory standard in question, we are bound to accept the agency view if it is not arbitrary or capricious or inconsistent with underlying congressional intent. When Congress has not delegated this function to the agency, we must undertake full interpretive responsibility ourselves, and we look to the agency view as a relevant, but not controlling, principle. It remains for this court initially to exercise its responsibility to interpret the statute to determine whether Congress

delegated the definitional function to the agency. *Trailways, Inc. v. ICC*, 727 F.2d 1284, 1288 (D.C.Cir.1984).[5]

We find no indication that Congress intended to delegate to the Commission broad discretion to determine rights of intervention under subsection (c)(7). "None of the usual indicia of congressional intent to delegate, such as the use of broad 'public interest' criteria, the presence of an established administrative practice when the statute was enacted, or specific references in the statute or legislative history, are present in this case." *Trailways, supra*, 727 F.2d at 1288. To the contrary, subsections (c)(7)(A) and (B) are the fruits of a conscious congressional effort to detail who should have a right to intervene. Prior to BRRA Congress had delegated to the Commission the responsibility to set requirements for intervention under broadly worded statutory language in 49 U.S.C. § 10328(b) (Supp. V 1981); *cf. generally American Trucking Ass'ns, Inc. v. ICC*, 627 F.2d 1313, 1320 (D.C.Cir.1980) (discussing prior scheme of broad delegation to the Commission), but in BRRA Congress itself took up the task of specifying criteria for intervention. Read against the backdrop of a prior practice of broad delegation, the specific language of subsection (c)(7) must be understood as Congress altering the prior scheme of delegated authority and exercising itself the lawmaking power with respect to defining who has a right to intervene in route application proceedings. *Cf. Trailways, supra*, 727 F.2d at 1288.

Thus the appropriate inquiry for this court is not whether the Commission's interpretation is reasonable. Rather, we must seek to discern whether Congress intended the language "authority to han-

standing on the ground that it failed to meet the requirement of 49 C.F.R. § 1160.93 that protestants submit a description of the extent to which they possess authority to handle traffic for which authority is sought, are fit to serve the routes, and have served the routes in a preceding 12-month period. This argument is frivolous. A perusal of Vanguard's protest to the Commission demonstrates that this information is contained therein. *See* Protest of Vanguard

Interstate Tours, *In re Mt. Kisco Bus Lines, Inc.*, JA 13.

5. We do not mean to suggest that an agency is without authority to interpret its governing statute unless Congress has explicitly delegated such authority; an agency has inherent authority to interpret its governing statute. The question we address here is the degree of deference we must give such an agency interpretation.

dle" to mean permanent authority. Undertaking this inquiry, we employ accepted methods of statutory construction; we scrutinize the statutory language and structure, search for indicia of specific congressional intent in the legislative history, and attempt to resolve ambiguity as to specific intent with an interpretation that best effectuates the underlying purposes of the statute. The Commission's view is highly relevant to our task, but does not control it.

■ "[T]he starting point for interpreting a statute is the language of the statute itself." *CPSC v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). By its terms, subsection (c)(7)(A) grants a right to intervene to any carrier that "possesses authority to handle, in whole or in part, the traffic for which [competing] authority is applied." 49 U.S.C.A. 10922(c)(7)(A)(i). This language suggests no dichotomy between permanent and temporary authority; its natural intendment would seem to encompass all forms of authority under which carriers serve routes—emergency temporary authority and temporary authority as well as permanent authority. Nor does the structure of subsection (c)(7)(A) indicate that Congress specifically intended to grant intervention as of right only to carriers with permanent authority. In fact, the Commission's reading is difficult to reconcile with the three-part test Congress established in the subsection. If we read the first condition—that the carrier possesses "authority"—as requiring permanent authority, then the second condition—that the carrier is "willing and able to provide service"—becomes superfluous; all carriers with permanent authority necessarily have been judged "fit, willing, and able" to have received their certificates of permanent authority initially. Conversely, if we read the first condition as encompassing those with temporary authority, then the existence of the second condition makes sense because those with temporary authority will not yet have been judged "fit, willing, and able." Nor does the legislative history lend any support to the Commission's view; Congress evinced no specific intent as to the proper scope of "authority" in subsection (c)(7)(A). Thus the only specific textual evidence of congressional intent—the natural meaning of "authority" and the structure of subsection (c)(7)—supports a reading of "authority" significantly broader than the Commission's, and the legislative history suggests no congressional intent that "authority" should be understood in the narrower sense.

The Commission urges us to adopt its reading despite this tension with both the natural meaning of "authority" and the structure of subsection (c)(7)(A), and despite the absence of support in the legislative history. This narrow reading, we are told, best advances the congressional purpose of easing entry into the market for passenger carriage by limiting the class of those permitted to raise "public interest" challenges to new applications. The Commission properly looks to congressional purpose for interpretive guidance. We do not, however, understand the Commission's argument to amount to a claim that *any* restrictive reading of "authority" in subsection (c)(7)(A)(i) advances Congress' purpose by limiting potential protestants and thereby smoothing the path for new entrants. Such a position would be untenable. Though Congress certainly sought to ease entry into the market for motor common carriage of passengers, the modifications of the regulatory scheme in BRRA reflect a clear and conscious compromise. Congress sought a large measure of deregulation but carefully preserved some elements of traditional "public interest" regulation where competition might threaten to reduce service to the public. *See Trailways, supra,* 727 F.2d at 1289; 128 Cong. Rec. S7709 (daily ed. June 30, 1982) (stating that BRRA would "provide an appropriate balance between the need for increased competition in the industry and the need to insure service in all parts of the country").

Quite obviously, a certain amount of tension inheres in the congressional effort to increase competition while maintaining some traditional "public interest" regula-

tion of motor transport. Yet Congress clearly intended the regulatory scheme established in BRRA to accommodate these potentially conflicting aims. Congress accomplished this accommodation largely through careful calibration of the statutory procedures for challenging route applications. The scope of congressionally defined intervention as of right in route application proceedings is central to effectuation of BRRA's careful compromise. If the group of potential intervenors is defined too broadly, the congressional goal of easing market entry will be thwarted. If the group is defined too narrowly, the congressional goal of retaining some traditional public interest regulation will be thwarted. Because we lack conclusive evidence of specific congressional intent with respect to the exact scope of intervention as of right, this court must seek to interpret subsection (c)(7) so as to best effectuate this congressional compromise embodied in BRRA.

Putting the best face on the argument that the Commission makes in this court, we read the Commission as asserting that the compromise goals of BRRA are best served by limiting intervention to "existing competitors of the prospective licensee with an economic interest in the proceedings," *see* brief for respondents at 15, and that only carriers holding permanent authority have such an economic interest. *Id.* We find persuasive the Commission's basic premise that the compromise goals of BRRA are best effectuated by limiting intervention as of right to existing carriers with an economic interest in the proceeding. Under BRRA's compromise, "public interest" is defined not in terms of protecting the economic interests of existing carriers *per se*, but primarily in terms of maximizing service to the public. *See* 49 U.S.C.

§ 10922(c)(3).[6] Given this definition, however, the public interest can be disserved only if a new competitor's entry into a particular market will adversely affect an existing *carrier* in that market in such a way that overall service to the public will diminish.[7] Since existing carriers will be in the position to, and have the most motivation to, demonstrate the potential adverse effects of a new carrier's proposed service on a particular route, a rule limiting intervention to such carriers serves the dual purpose of ensuring maximal service to the public and ensuring informed and vigorous presentation of "public interest" issues in Commission proceedings.

Though we accept the Commission's basic premise, we cannot accept the Commission's conclusion that only those holding permanent authority are existing competitors with an economic stake in the outcome of the proceedings. In our judgment, an interpretation of "authority" in subsection (c)(7)(A) that encompasses "emergency temporary authority" and "temporary authority" as well as permanent authority better serves congressional purposes. The facts of this case amply illustrate that holders of temporary authority are competitors with an economic stake in the routes they serve under such grants. A carrier must invest substantially to provide even temporary service, and such service can extend for 270 days or longer. In this case Vanguard operated 16 schedules daily, with $150,000 coaches, and incurred over $30,000 in initial marketing and promotion expenses. *See* Statement of John M. Silvanie, Vice President of Vanguard Interstate Tours, in Support of Motion for Stay Pending Review, June 28, 1983, *cited in* brief for petitioner at 5 & n. 3. More importantly, carriers typically obtain temporary au-

---

**6.** We do not mean to suggest that the Commission's public interest inquiry is strictly limited to an examination of the potential diminution of existing service on the same route. The terms of subsection (c)(3) suggest a somewhat broader field of inquiry. *See* note 2 *supra*. Under this subsection, however, it is clear that the primary focus is on possible diminution of overall service to the public.

**7.** This basic understanding is also reflected in the congressional judgment as to the situations

in which a "public interest" challenge can be raised. For unserved routes, BRRA greatly eases entry; no public interest challenge may be raised to an application for an unserved route. For routes already served by another carrier, entry is eased somewhat but public interest challenges may be raised against the prospective entrant on the ground that competition on the particular route will result in overall diminution of service to the public. *See* 49 U.S.C.A. § 10922(c)(1) & (4).

thority with the intent and expectation that it will mature into a grant of permanent authority. As noted in Part I, *supra*, Commission regulations recognize and encourage the practice. Precisely such a maturation of Vanguard's authority occurred in this case. At the time it held temporary emergency authority and temporary authority, Vanguard was without a doubt a competitor with Mt. Kisco on the routes in question and had a significant economic stake in those routes.

As we have seen, Congress intended the Commission's public interest inquiries to focus on diminution of existing service to the public. For this reason, intervention as of right under subsection (c)(7)(A) in route application proceedings should be limited to carriers whose existing service might be diminished as a result of competition from the prospective carrier. Carriage pursuant to a grant of temporary authority requires substantial investment indicative of a carrier's intent to provide such service permanently. Typically grants of temporary authority do mature into grants of permanent authority and Commission regulations accommodate the process. Thus carriage pursuant to temporary authority should not be considered as ephemeral in nature, but as an important form of public service that is likely to develop into permanent public service.[8] Carriers holding such authority should, therefore, be permitted to intervene as of right in Commission route application proceedings in order to press the argument that a prospective competitor will diminish existing service and thereby disserve the public interest.

In sum, we must reject the Commission's narrow reading of "authority." The natural intendment of the statutory language suggests a broader right of intervention that encompasses holders of "emergency temporary authority" and "temporary authority" as well as holders of permanent authority. Nothing in BRRA or its legislative history indicates that Congress intend-

ed "authority" be given a meaning narrower than its natural intendment. Most importantly, the broad reading best effectuates Congress' compromise goals by permitting all genuine existing competitors to bring public interest challenges to a new carrier's route applications. Thus Vanguard, as a holder of temporary authority at the time Mt. Kisco applied for permanent authority, had a statutory right to intervene to protest Mt. Kisco's application on public interest grounds.

### III. CONCLUSION

The Commission refused to allow Vanguard to intervene in the Mt. Kisco proceedings on the basis of an unduly narrow reading of subsection (c)(7)(A)(i). This error requires us to vacate the certificate of permanent authority awarded to Mt. Kisco and remand for new proceedings in which Vanguard will have full opportunity, consistent with Commission procedures, to present its claim that an award of permanent authority to Mt. Kisco will disserve the public interest.

*Vacated and remanded.*

---

**8.** A carrier holding temporary authority more certainly has an economic stake than does a mere applicant for permanent authority—and Congress specifically granted intervention as of right to applicants for permanent authority in § 10922(c)(7)(B). We will not assume that Congress intended the anomolous consequence that the latter should have a right to intervene while the former should not.