**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Petitioner,**

v.

**FEDERAL LABOR RELATIONS AUTHORITY, Respondent,**

**American Federation of Government Employees, AFL–CIO, etc., Intervenor.**

**No. 82–2310.**

United States Court of Appeals, District of Columbia Circuit.

Argued October 26, 1983.

Decided September 21, 1984.

---

Charles D. Ossala, Atty. U.S. Dept. of Justice, Washington, D.C., with whom J. Paul McGrath, Asst. Atty. Gen., and William Kanter, Atty., U.S. Dept. of Justice, Washington, D.C., were on the brief, for petitioner.

Robert J. Englehart, Atty., Federal Labor Relations Authority, Washington, D.C., with whom Steven H. Svartz, Sol., Federal Labor Relations Authority, Washington, D.C., was on the brief, for respondent. William E. Persina, Atty., Federal Labor Relations Authority, Washington, D.C., also entered an appearance for respondent.

Mark D. Roth, Washington, D.C., was on the brief for intervenor.

Before WRIGHT and TAMM, Circuit Judges, and MacKINNON, Senior Circuit Judge.

Opinion for the court filed by Circuit Judge TAMM.

Dissenting opinion filed by Senior Circuit Judge MacKINNON.

TAMM, Circuit Judge:

This is an appeal from a decision of the Federal Labor Relations Authority (the Authority) ordering petitioner Equal Employment Opportunity Commission (EEOC) to bargain over a union contract proposal that

requires compliance with applicable laws and regulations regarding "contracting-out." EEOC contends that it has no duty to bargain because the proposal concerns a subject exclusively reserved to management. The Authority has cross-petitioned for enforcement. For the reasons stated below, we enforce the Authority's order.

## I. BACKGROUND

### A. *Statutory Framework*

Title VII of the Civil Service Reform Act of 1978 (the Act), 5 U.S.C. §§ 7101–7135 (1982), substantially revised labor-management relations in the federal sector. The Act was designed to balance the right of federal employees to engage in concerted activity with the need of federal managers to achieve an "effective and efficient [federal] Government." 5 U.S.C. § 7101(b). To administer the Act and establish labor-management relations policy, Congress created the Federal Labor Relations Authority. The Authority's responsibilities include resolving issues relating to the duty to bargain.

The Act established a system of collective bargaining that requires federal agencies and employee unions to bargain in good faith "with respect to ... conditions of employment." 5 U.S.C. § 7103(a)(12). The term "conditions of employment" is expansively defined in the Act as "personnel policies, practices, and matters, whether established by rule, regulation, or otherwise, affecting working conditions." 5 U.S.C. § 7103(a)(14).

This broad duty to bargain is subject to certain limitations. Specifically, the Act contains a management rights clause that reserves certain prerogatives to management. 5 U.S.C. § 7106(a). Most important, for this case, the management rights clause reserves to management the authority "to make determinations with respect to contracting out." 5 U.S.C. § 7106(a)(2)(B). The procedures used in exercising these reserved management rights are subject to negotiation. 5 U.S.C. § 7106(b).[1]

### B. *The Facts*

■ The facts in this case are undisputed. During contract negotiations with the EEOC, the union[2] advanced the following proposal:

"The EMPLOYER agrees to comply with OMB Circular A–76 and other applicable laws and regulations concerning contracting-out."[3]

Joint Appendix (J.A.) at 2. EEOC declared the proposal nonnegotiable and refused to bargain over it. To resolve the dispute, the union filed a petition for review with the Authority. J.A. at 1.[4]

---

1. Section 7106 provides in pertinent part:
 (a) Subject to subsection (b) of this section, nothing in this chapter shall affect the authority of any management official of any agency—
 ....
 (2) in accordance with applicable laws—
 ....
 (B) to assign work, to make determinations with respect to contracting out, and to determine the personnel by which agency operations shall be conducted;
 ....
 (b) Nothing in this section shall preclude any agency and any labor organization from negotiating—
 ....
 (2) procedures which management officials of the agency will observe in exercising any authority under this section;
 ....
 5 U.S.C. §§ 7106(a)(2)(B), (b)(2).

2. The union, intervenor in this appeal, is the American Federation of Government Employees, AFL–CIO, National Council of EEOC Locals.

3. OMB Circular A–76 (the Circular) prescribes guidelines for determining whether the goods and services needed by the federal government should be acquired from the private sector or obtained "in-house" with government facilities and personnel. Joint Appendix (J.A.) at 37. The Circular specifies that the government generally should acquire its goods and services from private enterprise if it is cost-effective. The Circular contains a Cost Comparison Handbook outlining procedures to be followed in determining whether contracting-out is most cost-effective. Since the petition in this case was filed, OMB Circular A–76 has been revised. The revision in no way affects the issues before us.

4. 5 U.S.C. § 7105(a)(2)(E) provides that the Authority shall "resolve[ ] issues relating to the duty to bargain." The Act further provides that

EEOC argued before the Authority that the union proposal was nonnegotiable primarily for two reasons.[5] First, it contended that the proposal conflicted with the Act's express reservation to management of the right "to make determinations with respect to contracting out." 5 U.S.C. § 7106(a)(2)(B). Second, the EEOC argued that OMB Circular A–76 (the Circular) itself prohibited negotiation over the proposal.[6] J.A. at 12–13.

On September 2, 1982, the Authority issued a decision holding that the union proposal was a mandatory subject of bargaining. *American Federation of Government Employees, AFL–CIO National Council of EEOC Locals and Equal Employment Commission,* 10 FLRA 3 (1982). The Authority concluded that the proposal did not impair EEOC's statutory right to make contracting-out decisions because it recognized only existing limitations on EEOC's power. By its terms, ruled the Authority, the proposal established no substantive limitations on management discretion. *Id.*

The Authority further concluded that the proposal was not rendered nonnegotiable by the terms of the Circular. EEOC apparently asserted that adoption of the proposal would result in subjecting all contracting-out disputes to the negotiated grievance procedure, thus conflicting with the Circular's intent to allow EEOC to resolve such disputes internally.[7] The Authority rejected EEOC's underlying assumption that contracting-out disputes are not grievable in the absence of the proposed contract language. 10 FLRA at 4–5. Rather, the Authority found that such disputes were already grievable under section 7121 of the Act and that the Circular alone could not limit the *statutorily* prescribed scope of the grievance procedure.[8] 10 FLRA at 4–5. Concluding that the contract proposal was not prohibited by either the Act or the Circular, the Authority ordered EEOC to bargain. *Id.* at 5.

"if an agency involved in collective bargaining ... alleges that the duty to bargain in good faith does not extend to any matter, the [union] may appeal the allegation to the Authority." 5 U.S.C. § 7117(c)(1). The Authority is required to issue a written decision containing reasons for its determination. If the Authority concludes that the disputed issue is within the scope of the duty to bargain, it orders the agency to bargain in good faith. The Authority does not, however, address the merits of the proposal. See *Library of Congress v. FLRA,* 699 F.2d 1280, 1284 (D.C. Cir.1983).

If a proposal is determined to be within the duty to bargain, the parties must negotiate, although they may adhere to a particular position to the point of impasse. If an impasse is reached, the parties may refer the dispute to the Federal Service Impasses Panel. 5 U.S.C. §§ 7119(b), (c).

5. In addition to the two arguments noted here, the agency also asserted that the proposal fell outside the scope of the duty to bargain because it involved matters that do not directly affect conditions of employment. The FLRA's decision did not address this contention. American Federation of Government Employees, AFL–CIO, National Council of EEOC Locals and Equal Employment Opportunity Commission, 10 FLRA 3 (1982). Since the EEOC did not raise this argument in its petition to this court, we will not discuss the issue.

6. The Circular provides that its text "shall not be construed to create[ ] any substantive or procedural basis for any person to challenge any agency action or inaction on the basis that such action was not in accordance with [this] Circular, except as specifically set forth in [this Circular]." J.A. at 37. The Circular further directs agencies to develop procedures for an informal review of determinations made pursuant to its provisions and states that those procedures and agency determinations are not subject to negotiation or arbitration. J.A. at 50.

7. This argument is not expressly articulated in the EEOC's statement of position before the Authority. We therefore rely on the Authority's characterization of the agency's position. *See* American Federation of Government Employees, AFL–CIO, National Council of EEOC Locals and Equal Employment Opportunity Commission, 10 FLRA at 4–5 (1982).

8. 5 U.S.C. § 7121(a) requires all collective bargaining agreements to include a system for settling grievances. The negotiated grievance procedure must provide for binding arbitration for grievances not settled through the procedure. 5 U.S.C. § 7121(b)(3)(C). "Grievance" is broadly defined in the Act as any complaint concerning employment, the terms of a collective agreement, or the interpretation of any law, rule or regulation affecting conditions of employment. 5 U.S.C. § 7103(a)(9).

EEOC filed a timely petition for review in this court.[9] The FLRA filed a cross-petition for enforcement. We have jurisdiction pursuant to 5 U.S.C. § 7123.[10]

## II. STANDARD OF REVIEW

■■■ The Act provides that the Authority's rulings are reviewable in accordance with section 10(e) of the Administrative Procedure Act (APA), 5 U.S.C. § 706 (1982). *See* 5 U.S.C. § 7123(c) (1982). The Authority's determinations will thus be upheld "if they are supported by substantial evidence[,] ... are not arbitrary, capricious, or an abuse of discretion[,] and are otherwise in accordance with law." *National Treasury Employees Union v. FLRA*, 721 F.2d 1402, 1405 (D.C.Cir.1983). Review is further circumscribed where, as here, the Authority has construed its enabling legislation. Indeed, the Authority is entitled to "considerable deference" when interpreting and applying the Act's provisions to specific situations. *Bureau of Alcohol, Tobacco and Firearms v. FLRA*, — U.S. ——, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983). Accordingly, we will uphold the Authority's interpretation of the

Act if it is "reasonably defensible," *Department of Defense v. FLRA*, 659 F.2d 1140, 1162 n. 121 (D.C.Cir.1981), *cert. denied*, 455 U.S. 945, 102 S.Ct. 1443, 71 L.Ed.2d 658 (1982); *Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 104 S.Ct. at 444 (1983), and not inconsistent with any congressional mandate or policy.[11]

## III. ANALYSIS

EEOC asserts that the Authority improperly construed the terms of the management rights clause, as well as the probable effect of the disputed proposal. EEOC suggests first that the plain text of the management rights clause insulates from collective bargaining *all* proposals regarding contracting-out. Second, EEOC contends that the proposal is nonnegotiable because its adoption would subject contracting-out decisions to the statutorily prescribed grievance procedure, thus infringing on EEOC's reserved authority to make contracting-out decisions. Finally, EEOC argues that the proposal is inconsistent with the Circular.

**9.** EEOC filed a request for reconsideration with the Authority on September 16, 1982. J.A. at 64. On March 18, 1983, the Authority issued an order denying the EEOC's request. Brief for Federal Labor Relations Authority at C-1.

**10.** 5 U.S.C. § 7123(a) provides that "[a]ny person aggrieved by any final order of the Authority ... may ... institute an action for judicial review of the Authority's order ... in the United States Court of Appeals for the District of Columbia." The Authority may petition any appropriate United States court of appeals for enforcement of any of its orders. 5 U.S.C. § 7123(b).

**11.** The dissent contends that the Act's reservation to management of the right to contract-out is a limitation on the Authority's power to direct labor-management relations. Consequently, argues the dissent, the Authority's interpretation of the scope of management's reserved rights is not entitled to great deference. The dissent ignores the fact that the dispute here concerns the negotiability of a specific proposal. Congress has expressly entrusted to the Authority the power and the obligation to resolve all such disputes. *See supra* note 4. Decisions in this circuit have uniformly recognized that the Au-

thority, and not the court, must exercise the judgment necessary to determine whether a proposal that allegedly violates management's rights is bargainable. "[T]he distinction between proposals encroaching on management's non-negotiable substantive authority and those concerning properly negotiable procedural matters [is] primarily to be made by the Authority in an exertion of its expertise ...." *National Treasury Employees Union v. FLRA*, 691 F.2d 553, 561 (D.C.Cir.1982) (footnote omitted) (citing *Department of Defense v. FLRA*, 659 F.2d 1140, 1161 (D.C.Cir.1981), *cert. denied*, 455 U.S. 945, 102 S.Ct. 1443, 71 L.Ed.2d 658 (1982)).

The dissent's reliance on *Vanguard Interstate Tours, Inc. v. ICC*, 735 F.2d 591 (D.C.Cir.1984), is misplaced. In the statute at issue in *Vanguard*, Congress expressly limited the discretion previously granted to the ICC and set out the precise criteria governing the issue in the case. Here, in contrast, Congress has expressly delegated to the Authority the task of resolving issues relating to the duty to bargain. We therefore conclude that even if the management rights clause acts as a limitation on the power of the Authority, the Authority's exercise of its expertise primarily to determine whether an issue in a particular case is negotiable is entitled to deference.

## A.

EEOC asserts that the management rights clause gives management unfettered authority to make contracting-out determinations. Apparently assuming that any proposal regarding contracting-out will restrict this authority, EEOC suggests that the management rights clause renders nonnegotiable *all* proposals regarding contracting-out.

■■■ EEOC's argument is untenable in light of the plain text of the clause. The management rights clause provides that "nothing in [Title VII] shall affect the authority of any management official of any agency—. . . in accordance with applicable laws—. . . to make determinations with respect to contracting out." 5 U.S.C. § 7106(a)(2)(B). This language plainly restricts the authority reserved to management by requiring that it be exercised "in accordance with applicable laws." In addition, section 7106(b) provides that procedures used to exercise rights are negotiable. *See supra* note 1. Because the Act does not grant to management unqualified authority to contract-out, union proposals touching upon that authority are not automatically rendered nonnegotiable. Rather, management may refuse to bargain over only those proposals that would expand upon the restrictions contained in the Act. *See infra* note 12.

The union proposal here suggests contract language that essentially echoes the statutory requirement that contracting-out determinations be made in accordance with applicable laws. Any restriction imposed by the proposal on management's contracting-out authority thus stems from the Act's mandate. EEOC, of course, must comply with these requirements regardless of whether the proposal is adopted as part of the collective agreement. The union proposal at issue here thus does not of itself establish any substantive criteria guiding management's contracting-out determinations. We therefore agree with the Authority's conclusion that the proposal does not affect management's reserved authority, within the meaning of the statutory language, to make contracting-out decisions.[12]

EEOC points to no expression of intent in the legislative history that contradicts this conclusion. Though far from conclusive, the legislative history indicates that the management rights clause should not be interpreted to negate the Act's broad duty to bargain. In adopting the management rights clause, Congress sought to reserve to management the authority necessary to achieve an effective and efficient government. At the same time, however, Congress intended to broaden the scope of bargaining beyond that sanctioned under the previous labor-management relations

12. The precise scope of management's reserved authority is difficult to define. In previous rulings, the Authority has effectively defined the protection accorded management by classifying proposals as either negotiable procedures under section 7106(b) or nonnegotiable substantive rights. To distinguish between the two, the Authority has developed a "direct interference" test. Under this test, a proposal involves a nonnegotiable substantive right if it would "directly interfere" with management's ability to make the relevant determination. We have repeatedly affirmed the Authority's use of this test. *See Department of Defense v. FLRA*, 659 F.2d 1140, 1159 (D.C.Cir.1981), *cert. denied*, 455 U.S. 945, 102 S.Ct. 1443, 71 L.Ed.2d 658 (1982). Although in the present case the Authority did not expressly classify the proposal as procedural and did not explicitly apply the direct interference test, the analysis used was quite similar. In concluding that the proposal was negotiable, the Authority focused on the agency's retention of the full degree of discretion that exists in the absence of the proposal. We find this analysis fully acceptable as a guideline to determine the scope of substantive rights reserved to management.

The dissent misconstrues both the direct interference test and the import of our conclusion here. The direct interference test is essentially definitional. It determines whether a particular proposal is in fact substantive and therefore nonnegotiable. Although the Authority did not expressly apply this test here, it did use the same functional analysis: only proposals that limit substantively management's contracting-out determinations involve nonnegotiable rights. Implicit in the Authority's opinion is the conclusion that the disputed proposal represents more of a procedural than a substantive limitation on management's right to contract-out.

system.[13] Thus, as one member explained, the clause was designed to protect "genuine managerial prerogatives." [14] Indeed, Congress directed that the clause was to "be read to favor collective bargaining whenever there is doubt as to the negotiability of a subject or a proposal." [15]

■ In sum, neither the text nor the legislative history mandates a conclusion other than that reached by the Authority. We cannot say, therefore, that the Authority acted arbitrarily in concluding that the proposal does not affect EEOC's reserved rights. We reject EEOC's argument that the management rights clause renders the proposal nonnegotiable.

### B.

■ EEOC argues next that even if the text of the proposal does not impose additional restrictions, its adoption would effectively hinder EEOC's ability to make contracting-out decisions. Specifically, EEOC contends that the proposal would invade its reserved management rights by making compliance with the Circular a contractual prerequisite of any decision regarding contracting-out. The union could then challenge EEOC's decisions to con-

tract-out by alleging that EEOC violated the collective agreement in failing to comply with appropriate procedures. Any contracting-out decision would then be subject to grievance procedures and ultimately to arbitral review. According to EEOC, contracting-out decisions could thus become the prerogative not of management but of the arbitrator. In this way, EEOC implies, the union would be able to achieve precisely what the management rights clause was intended to prevent.

EEOC's argument assumes that a complaint asserting that a contracting-out determination was not made in accordance with applicable laws, including the Circular, would not be grievable in the absence of the contract proposal. This assumption, however, is contrary to the text of the Act.

The Act expansively defines the subjects covered under the statutory grievance procedure. Grievances include complaints concerning "any claimed violation, misinterpretation, or misapplication of any law, rule, or regulation affecting conditions of employment" as well as complaints "concerning any matter relating to the employment of the employee." 5 U.S.C. § 7103(a)(9).[16] Only five subjects, not including the subject of contracting-out, are expressly ex-

---

13. H.R.REP. No. 1403, 95th Cong., 2d Sess. 43 (1978), *reprinted in* House of Representatives Committee on Post Office and Civil Service, 96th Cong., 1st Sess., Legislative History of the Federal Service Labor-Management Relations Statute, Title VII of the Civil Service Reform Act of 1978 [hereinafter cited as Legislative History] at 689 (1979); *see National Treasury Employees Union v. FLRA*, 691 F.2d 553, 559 (D.C.Cir.1982).

14. 124 CONG.REC. 29,199 (1978) (remarks of Rep. Ford), *reprinted in* Legislative History at 956.

15. H.R.REP. No. 1403, 95th Cong., 2d Sess. 44 (1978), *reprinted in* Legislative History at 690. The management rights clause that appears in the Act was adopted as an amendment on the House floor to the clause reported by the House Committee on Post Office and Civil Service. This amendment, however, did not change the purpose behind the clause as explained in the report accompanying the Committee version of the bill. "This substitute [the amendment that was adopted on the floor] strengthens the 'Management rights' section reported by the Committee, but it is still to be treated narrowly as an exception to the general obligation to bargain

over conditions of employment." 124 CONG.REC. 29,183 (1978), *reprinted in* Legislative History at 924. The amendment adopted on the House floor was adopted by the House-Senate Conference Committee without change. H.R.REP. No. 1717, 95th Cong., 2d Sess. 153–54 (1978) (Conference Report), U.S.Code Cong. & Admin.News 1978, p. 2723, *reprinted in* Legislative History at 821–22.

16. 5 U.S.C. § 7103(a)(9) provides in full:
 (9) "grievance" means any complaint—
 (A) by any employee concerning any matter relating to the employment of the employee;
 (B) by any labor organization concerning any matter relating to the employment of any employee; or
 (C) by any employee labor organization, or agency concerning—
 (i) the effect or interpretation, or a claim of breach, of a collective bargaining agreement; or
 (ii) any claimed violation, misinterpretation, or misapplication of any law, rule, or regulation affecting conditions of employment.

cluded from coverage under the grievance mechanism.[17] An allegation that the EEOC failed to comply with the OMB Circular, or with any other law or rule governing contracting-out, plainly falls within this expansive definition.[18]

EEOC maintains, however, that in addition to the five subjects expressly designated in section 7121 of the Act, all prerogatives reserved to management under the management rights clause are excluded from the scope of matters grievable. EEOC asserts that because the manage-

ment rights clause provides that "*nothing in this chapter* shall affect" management's authority to contract-out, such decisions are removed from grievance procedures. 5 U.S.C. § 7106(a) (emphasis added). A grievance alleging noncompliance with the Circular, however, does not affect management's substantive authority, within the meaning of the statutory language, to contract-out. Rather, it provides a procedure for enforcing the Act's requirement that contracting-out decisions be made in accordance with applicable laws.[19] Any substantive limitation on management's au-

17. The [sections requiring a grievance procedure] shall not apply with respect to any grievance concerning—
 (1) any claimed violation of subchapter III of chapter 73 of this title (relating to prohibited political activities);
 (2) retirement, life insurance, or health insurance;
 (3) a suspension or removal under section 7532 of this title;
 (4) any examination, certification, or appointment; or
 (5) the classification of any position which does not result in the reduction in grade or pay of an employee.
 5 U.S.C. § 7121(c).

18. The dissent contends that a complaint asserting a failure to comply with the Circular does not fall within the statutory definition of grievance. Because the Act defines grievance to include claims alleging violations of regulations "affecting conditions of employment," and because "conditions of employment" is in turn defined as "matters affecting working conditions," the dissent maintains that grievances are restricted to claims involving surroundings and hazards.
 The dissent's narrow definition of "working conditions" does not apply in the context of this Act. The definition of working conditions as hazards and surroundings derives from *Corning Glass Works v. Brennan*, 417 U.S. 188, 201–03, 94 S.Ct. 2223, 2231–2232, 41 L.Ed.2d 1 (1974), a case construing the language of the Equal Pay Act. The Court in *Corning Glass Works* based its definition of the term "working conditions" on Congress's intent as expressed in an extensive discussion of the term in the legislative history of the Equal Pay Act. The Court noted that "working conditions" has a generally accepted meaning in the "specialized language of job evaluation systems." 417 U.S. at 202, 94 S.Ct. at 2232. A definition adopted in the context of a specific statute and in light of a detailed legislative history, however, is not immediately transferable to this case. *See Copper Valley Machine Works, Inc. v. Andrus*, 653 F.2d

595, 600 n. 7 (D.C.Cir.1981). The legislative history of Title VII nowhere indicates that Congress intended such a restriction on the rights granted employees. Indeed, the Authority has consistently adopted, with this court's sanction, a *broad interpretation* of the phrase "conditions of employment." *See Department of Defense v. FLRA*, 685 F.2d 641, 647–48 & n. 3 (D.C.Cir. 1982); National Treasury Employees Union and Internal Revenue Service, 3 FLRA No. 112 at 693, 695 (1980) (conditions of employment concerns working situation and employment relations of bargaining unit employee). Moreover, as the dissent itself notes, the term "conditions of employment" includes personnel policies and practices as well as matters affecting working conditions. *See* Dissent at n. 12. Even if the phrase "matters affecting working conditions" comprises only hazards and surroundings, contracting-out decisions, which ultimately may result in a layoff, undoubtedly fall under the umbrella of personnel policies or practices.
 In addition, we note that the dissent's restrictive definition applies only to grievances defined in section 7103(a)(9)(C)(ii) as violations of regulations affecting conditions of employment. The dissent's analysis, of course, does not apply to grievances defined in sections 7103(a)(9)(A) or (B) as any matter relating to the employment of an employee. A claim that work was improperly contracted out surely falls within this definition of grievance.

19. The dissent maintains that grievances alleging a failure to comply with applicable laws regarding contracting-out will affect management by delaying implementation of a decision. Of course, any review of an agency decision, whether conducted by the courts or through a contractual grievance mechanism, may cause some delay. This court has previously recognized that a proposal that may result in delay, including delay created by the arbitral process, need not infringe management's reserved authority, and may thus be negotiable. *See Department of Defense v. FLRA*, 659 F.2d at 1153–58.

thority stems from the externally established criteria contained in the Circular. *See supra* text accompanying note 12. We therefore find that a grievance asserting that management failed to comply with its statutory or regulatory parameters in making a contracting-out decision is not precluded by the management rights clause.[20]

The statutorily defined grievance procedure therefore encompasses a claim that a contracting-out determination was not made in accordance with law. EEOC's initial assumption that including the proposal in the collective bargaining agreement would expose for the first time EEOC's contracting-out determinations to employee grievance challenges, and arbitral review, is contradicted by the plain text of the Act. We thus conclude that adoption of the proposal in no way expands an employee's right to challenge management's contracting-out decisions under the grievance procedure.[21] Accordingly, we reject EEOC's contention that the proposal will impair its management rights by making compliance with the Circular a contractual prerequisite of contracting-out decisions.

### C.

 Finally, EEOC argues that the language of the OMB Circular renders the proposal nonnegotiable. As noted, the Circular states that its provisions "shall not be construed to create" any right of appeal except as provided in the Circular itself. J.A. at 37. EEOC maintains that the Authority's ruling that the proposal is negotiable conflicts with the Circular's limiting language because it allows alternative enforcement actions through the grievance mechanism. Two considerations compel us to reject this argument.

First, the proposal is not inconsistent with the Circular's limiting language. The proposal does not "create" any new right of appeal. Rather, as we have already determined, the right to file grievances regarding contracting-out decisions is created by the Act.

Second, and more important, the Circular's restrictive language cannot be construed to limit the statutory right to file grievances asserting a violation of contracting-out regulations. There is no indication in the Act or elsewhere of a congressional intent to allow agencies to limit by regulation the statutorily defined grievance procedure. To allow the text of the Circular to restrict the scope of grievances would place "limitations in the statute not placed

---

**20.** Our reading of the text of the Act is supported by the legislative history. Congress unambiguously stated that the management rights clause, at least in one instance, does not affect an employee's right to enforce the Act's requirement that management exercise its reserved right in accordance with applicable laws and regulations.

> [M]anagement has the reserved right to make the final decision to "remove" an employee, but that decision must be made in accordance with applicable laws and procedures, and the provisions of any applicable collective bargaining agreement. The reserved management rights to "remove" would in no way affect the employee's right to appeal the decision through statutory procedures or, if applicable, through the procedures set forth in a collective bargaining agreement.

124 CONG.REC. 29,183 (1978), *reprinted in* Legislative History at 924. Similarly, we believe that EEOC's reserved right to make determinations regarding contracting-out does not insulate EEOC from challenges, through the grievance mechanism, asserting violations of applicable laws or regulations. *Cf. National Treasury Em-*

*ployees Union v. FLRA*, 691 F.2d 553, 564–65 (D.C.Cir.1982) (noting that although establishment of performance standards is encompassed within management's reserved rights, employees may challenge those standards in grievance proceedings).

The dissent suggests that this conclusion requires us to construe the statutory grievance mechanism as an applicable law with which management must comply. This construction, suggests the dissent, does not comport with the statutory language which states that "nothing in Title VII shall affect" management's authority to make determinations regarding contracting-out. We do not determine here whether the section 7121 grievance mechanism is an "applicable law." Rather, we conclude only that a grievance alleging that management has not complied with externally established criteria does not affect management's reserved substantive authority.

**21.** The scope of the grievance procedure can of course be limited in negotiation. We address here only the *statutorily* defined grievance procedure.

there by Congress." *Colgate-Palmolive Peet Co. v. NLRB*, 338 U.S. 355, 363, 70 S.Ct. 166, 171, 94 L.Ed. 161 (1949). Accordingly, we reject EEOC's argument that the Circular bars negotiation over the proposal.[22]

## IV. CONCLUSION

For the reasons stated herein, we conclude that the Authority's interpretation should be upheld and that its order should be enforced.

*Judgment accordingly.*

MacKINNON, Senior Circuit Judge, dissenting:

Because I believe that the majority opinion seriously misreads the statute which controls this case, I consider it my duty to dissent. The opinion of the majority holds that the EEOC must bargain over a proposal which, under the Federal Labor Relations Authority's (FLRA's) interpretation of the statute, is a total nullity. The majority holds that incorporation into the collective bargaining agreement of a promise to comply with applicable regulations, including OMB Circular A–76, does require that all "contracting-out" decisions be subject to grievance determinations, but that such a provision affects neither management's authority to contract out nor the existing union remedies for violations of that regulation.[1]

The FLRA essentially held that (1) management has a right to make determinations regarding contracting-out; (2) such determinations must be made in accordance with applicable regulations; (3) violations of such regulations are *already grievable* under the Civil Service Reform Act of 1978 without regard to the necessity of making them grievable in a collective bargaining agreement; and thus (4) a provision in a collective bargaining agreement requiring adherence to such regulations does not infringe the agency's specific, existing right to "contract out" because it does not make nongrievable matters grievable. The essential flaw in the FLRA's reasoning—and the one adopted by the majority—is that, contrary to its assertion, violations of Circular A–76 and other regulations regarding *substantive* contracting-out decisions are *not* statutorily grievable. Hence, inclusion in a collective bargaining agreement of a promise to comply with the Circular's terms would permit the union to seek arbitration on issues that are *not* now grievable, and would create arbitral review of determinations specifically entrusted by Congress to the EEOC and all other federal agencies. This far-reaching decision potentially affects *every* non-exempt federal agency.

The union plainly recognizes this; why else does it seek so strenuously to impose a collective bargaining provision that—the majority implicitly asserts—gives it nothing it did not already possess? Far from

---

**22.** EEOC also argues that section 7117(a)(1) of the Act, which prohibits bargaining over matters that are inconsistent with other laws, limits the matters subject to grievance procedures. 5 U.S.C. § 7117(a)(1). EEOC asserts that bargaining over contracting-out is inconsistent with the management rights clause and therefore contracting-out determinations are excluded from the grievance mechanism. Reply Brief for Petitioner at 5. EEOC's assertion that the proposal at issue in this case is inconsistent with other law is derivative in nature. EEOC contends the proposal is inconsistent with the management rights clause. We have already stated, however, that the management rights clause does not, on its face, render this proposal nonnegotiable. The proposal cannot be "inconsistent with other law" if it is not inconsistent with the management rights clause.

**1.** The FLRA has previously held that a proposal which purported to bind an agency to the specific terms of Circular A–76 as of the date of the proposal—thus, in effect, prohibiting the government from subsequently changing the regulation—was non-negotiable. *See* National Federation of Federal Employees, Local 1167, 6 F.L.R.A. 574, 577 (1981). In the instant case, the language at issue ("The [agency] agrees to comply with OMB Circular A–76") can also be read, like that in *Local 1167*, to require compliance with the *present* terms of the Circular. The FLRA, however, apparently has interpreted the proposal only to require the agency to comply with the Circular as it is amended from time to time.

being a nullity, the decision of the majority seriously infringes on the authority, specifically reserved to the EEOC and all other agencies by Congress, "to make determinations with respect to contracting out." 5 U.S.C. § 7106(a)(2)(E).

## I. STANDARD OF REVIEW

The majority recognizes that "[r]eview of the Authority's order shall be on the record in accordance with [5 U.S.C. § 706]." 5 U.S.C. § 7123(c). Section 706 provides:

The reviewing court shall—

. . . . .

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or *otherwise not in accordance with law;* [or]

. . . . .

(C) *in excess of statutory jurisdiction, authority, or limitations, or short of statutory right* ....

(Emphasis added.) Thus, the standard of review for FLRA decisions was spelled out recently by Justice Brennan in *Bureau of Alcohol, Tobacco and Firearms v. FLRA,* — U.S. ——, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983):

Like the National Labor Relations Board, ... the FLRA was intended to develop specialized expertise in its field of labor relations and to use that expertise to give content to the principles and goals set forth in the Act.... Consequently, the Authority is entitled to considerable deference when it exercises its "special function of applying the general provisions of the Act to the complexities" of federal labor relations....

On the other hand, the "deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption by an agency of major policy decisions properly made by Congress." ... Accordingly, *while reviewing*

*courts should uphold reasonable and defensible constructions of an agency's enabling Act, ... they must not "rubber stamp ... administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute."*

(Emphasis added.) Applying this standard, the Court unanimously reversed the FLRA's own construction of its enabling statute. The same principle calls for reversal here.

Courts should be especially cautious about giving undue deference to agency construction of enabling legislation when the particular provision being construed is one designed to act as a *limitation* on the agency. As this court recently pointed out,

When Congress' intent is to delegate to the agency the task of supplying the meaning of the statutory standard in question, we are bound to accept the agency view if it is not arbitrary or capricious or inconsistent with underlying congressional intent. *When Congress has not delegated this function to the agency, we must undertake full interpretive responsibility ourselves, and we look to the agency view as a relevant, but not controlling, principle.* It remains for this court initially to exercise its responsibility to interpret the statute to determine whether Congress delegated the definitional function to the agency.

*Vanguard Interstate Tours v. ICC,* 735 F.2d 591, 596 (D.C.Cir.1984); *Trailways, Inc. v. ICC,* 727 F.2d 1284, 1288 (D.C.Cir. 1984).

If Congress intended a particular provision to *limit* the authority of an agency, deferring to an agency decision which eviscerated that provision would foil that legislative intent. When Congress limits the discretion of an agency, a court is remiss if it permits the agency to circumvent that limitation through construction of the statute.[2] It is doubly remiss if in doing so it

---

**2.** In *Department of Justice v. FLRA,* 709 F.2d 724, 729–30 (D.C.Cir.1983), the FLRA tried to

require bargaining by an agency over procedural protections for probationary employees.

violates a clear grant of specific management discretion to another agency.

In Chapter 71 of Title 5 ("Labor-Management Relations"), which creates the FLRA, Congress specifically provided that "nothing in [Chapter 71] shall *affect* the authority of any management official of any agency ... in accordance with applicable laws ... to make determinations with respect to contracting out." 5 U.S.C. § 7106(a)(2)(B) (emphasis added). This specific recognition of authority in all federal agencies affirmatively denies to the FLRA any authority to "affect" the authority of an agency to "contract out." An FLRA decision which encroached on this specifically recognized power would thus violate the plain intent of Congress. Since Congress cannot have intended to give the FLRA discretion to erode the limitations it specifically placed on that Authority by statute, it cannot have intended that courts give great deference to the FLRA's construction of such limitations.[3] To the extent, then, that the FLRA's decision exceeds its "statutory jurisdiction, authority, or limitations," 5 U.S.C. 706(2)(C), it is not entitled to deference. This court "must undertake full interpretive responsibility [itself], and ... look to the agency view as a relevant, but not controlling, principle." *Vanguard Interstate, supra,* 735 F.2d at 596.

## II. ANALYSIS

Although the majority asserts that the plain language of the relevant statutory provisions supports *its* construction, *see* Maj. at 848, 851, the relevant language points plainly to exactly the opposite interpretation.

(The right to dismiss probationary employees is reserved to management under provisions in other parts of U.S.C. Title 5.) This court refused to defer to the agency's construction of the labor relations provisions at issue. But in *AFGE, Local 2953 v. FLRA,* 730 F.2d 1534, 1547–48 (D.C. Cir.1984), we affirmed the agency's decision that a proposal requiring National Guard units to ignore military efficiency when implementing reductions-in-force was *non*-bargainable.

**3.** The majority relies for its highly deferential stand—*see* Maj. at n. 11—on *National Treasury*

### A.

Section 7106 provides:

(a) Subject to subsection (b) of this section, *nothing in this chapter shall affect the authority of any management official of any agency—*

(1) to determine the mission, budget, organization, *number of employees,* and internal security practices of the agency; and

(2) in accordance with applicable laws—

. . . . .

(B) to assign work, *to make determinations with respect to contracting out,* and to determine the personnel by which agency operations shall be conducted ....

(b) Nothing in this section shall preclude any agency and any labor organization from negotiating—

(1) *at the election of the agency,* on the numbers, types, and grades of employees or positions assigned to any organizational subdivision, *work project,* or tour of duty, or on the technology, methods, and means of performing work;

(2) *procedures* which management officials of the agency will observe in exercising any authority under this section; or

(3) appropriate *arrangements* for employees adversely affected by the exercise of any authority under this section by such management officials.

5 U.S.C. § 7106 (emphasis added). In other words, this section of the Act on its face specifically provides that *nothing* in Chap-

*Employees Union v. FLRA,* 691 F.2d 553 (D.C. Cir.1982), in which the Authority, with scrupulous concern for the limitations imposed on it by Congress, held that it could *not* order bargaining over a particular proposal without infringing on management rights. This court deferred to the Authority's interpretation. But that decision does *not* require us to uphold the Authority's use of its interpretive power to emasculate specific Congressional restrictions on its authority.

ter 71 can circumscribe management's authority to make decisions regarding contracting-out, *except* for the limitations in § 7106(b). Subsection 7106(b) provides that management may negotiate (1) *"procedures* which ... the agency will observe in exercising [its reserved] authority," (2) "appropriate *arrangements* for employees adversely affected by the exercise of [such] authority" (emphasis added), and (3) at its election, assignment of employees to particular work projects and the means of carrying out such projects.

Significantly, the FLRA did *not* attempt to construe the contract proposal at issue as relating to "procedures ... the agency will observe" in implementing its contracting-out decisions, a fact which the majority recognizes. *See* Maj. at 848 n. 12. Indeed, it is difficult to comprehend how OMB Circular A–76 *could* fit under the provisions of § 7106(b). The purpose and scope of that Circular are spelled out in its first paragraph:

> *Purpose.* This Circular establishes Federal policy regarding the performance of commercial activities. The Supplement to the Circular sets forth procedures *for determining whether commercial activities should be performed under contract with commercial sources or in-house using Government facilities and personnel.*

OMB Circular No. A–76 (rev. Aug. 4, 1983) (emphasis added). In other words, the Circular and its accompanying Supplement are designed to offer guidance to agencies in making the decision to contract out—*i.e.*, to provide *substantive policy-making criteria* —not procedures for carrying out decisions already made. If (1) the Circular provides substantive criteria for contracting out, and (2) bargaining over substantive criteria for contracting out is prohibited by law, then (3) a collective bargaining proposal which purports to *require* an agency to meet substantive criteria is *not* negotiable. It therefore does not appear that the FLRA

*could* rationally have based its decision on the "procedures" provision of § 7106(b). In any event—even assuming that the language could be twisted into supporting that position—the FLRA did not do so, and this court is prohibited from relying on a ground not advanced by the agency. *See SEC v. Chenery Corp.*, 318 U.S. 80, 95, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943) ("administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained"); *NLRB v. Enterprise Association of Pipefitters*, 429 U.S. 507, 522 n. 9, 97 S.Ct. 891, 900 n. 9, 51 L.Ed.2d 1 (1977) (*Chenery* rule "has not been disturbed" by subsequent decisions).

The majority attempts to escape this problem by arguing that, while the FLRA did not specifically find that this provision was procedural, it nevertheless used "similar" analysis to that used in cases involving procedures, *i.e.*, its "direct interference" test. Maj. at 848 n. 12. The simple answer to this is that a test for determining the validity of *procedural* provisions is entirely irrelevant to the validity of *substantive* restrictions. Under § 7106, restrictions on *procedures* which indirectly affect contracting-out by management may well be proper because they fall within § 7106, but *non-procedural* restrictions which affect that *right* —whether directly *or* indirectly—are clearly not.

Moreover, the limited scope of the term "procedures" in subsection (b)(2) is emphasized by subsection (b)(1), in which Congress provided for bargaining over "the employees or positions assigned to any ... work project, ... or on the ... methods, and means of performing work," but *only* "at the election of the agency." Congress recognized the right of any agency to elect to bargain on some subjects that are not mandatory. Congress' specific treatment of *work projects* belies the majority's construction of the statute.[4] It makes little

---

**4.** Congress did not define the term. "work project" in the Act. By analogy to the term "project works," however, a "work project" may

be considered to be a project that constitutes a *part* of the agency's complete work load. *See Ontario Land Dev't & Beach Protection Ass'n v.*

sense to suggest that "contract[ing] out" any specific work project is a mandatory subject of negotiation when this subsection clearly provides that negotiation on "any work project" is "at the election of the agency."

It may be that the key to the majority's opinion is its footnote 12. Although the Authority itself did not hold that the proposal at issue was only "a procedure" under § 7106(b), the majority finds in that footnote that the proposal really *is* merely procedural, and hence the management rights provisions do not apply at all.[5] But neither the Authority's opinion—despite the majority's divination of what that agency meant but did not say—nor the language and history of the statute lends any support to the notion that requiring compliance with substantive decision-making criteria, and subjecting such substantive decisions to arbitral review, is nothing more than a "procedure" for exercising authority to contract out.

### B.

The majority, however, does not attempt to rely solely on a *sua sponte* finding that the provision at issue is procedural. Instead, it rests heavily on another limitation it finds in § 7106: the requirement that decisions regarding contracting-out be made "in accordance with applicable laws." The majority perforce construes this to mean "in accordance with the other provisions of Chapter 71."

It should first be pointed out that the FLRA in its opinion did not offer this interpretation of the statute as a basis for its decision, and thus the majority is not only speculating in relying on this as a ground, but is also ignoring the principles of *Chenery, supra*. The FLRA, in fact, heretofore has recognized that substantive decisions regarding management rights are *not* reviewable under the grievance procedure:

> Under the plain language of section 7106(a), of course, "nothing" in the Statute shall "affect the authority" of an agency to exercise the rights enumerated therein. Hence, no matter could be grieved under a procedure negotiated pursuant to section 7121 of the Statute which would deny the authority of an agency to exercise its statutory rights under section 7106.

*AFGE Local 2782*, 6 F.L.R.A. 314, 319–21 (1981) (footnote omitted). There is no suggestion in *Local 2782* that the phrase "in accordance with applicable laws" can be used to permit grievance review of non-negotiable *substantive* decisions.[6]

But even assuming that the FLRA had proffered this interpretation,[7] it could not

---

*FPC*, 212 F.2d 227, 232 (D.C.Cir.1954); *cf. Chemehuevi Tribe of Indians v. FPC*, 420 U.S. 395, 401, 95 S.Ct. 1066, 1071, 43 L.Ed.2d 279 (1975) (Congress recognized in definition that "project works" were limited to part of a whole project).

5. If this is, in fact, what the majority is holding, then footnote 12 probably renders the remainder of the majority's opinion—particularly its discussion of the phrase "in accordance with applicable laws"—mere verbiage, because it is crystal clear that "procedures" for carrying out decisions are not within the management rights clause.

6. The FLRA's decision in *Local 2782* dealt with a proposal for repromoting individuals who had been reduced in grade due to management cutbacks. It was not a case where substantive regulations were involved; the FLRA carefully pointed out, 6 F.L.R.A. at 321, that it involved simply "appropriate arrangements for employees adversely affected by management's exercise of its authority under section 7106(a)," which

are negotiable under the explicit provisions of 5 U.S.C. § 7106(b)(3).

7. This interpretation arguably was advanced by the FLRA in National Federation of Federal Employees, Local 1497, 9 F.L.R.A. 151 (1982). In that case, the union proposed that "[w]ork assignments shall not be in violation of prohibited personnel practices nor any relevant law, rule, or regulation." The right to assign work is one of the management rights reserved under § 7106(a). The FLRA held that since the agency was required to exercise its management rights "in accordance with applicable law," a contract provision binding it to do so did not interfere with its rights. 9 F.L.R.A. at 156. Implicit in this determination is the assumption that a violation of the work assignment regulations would fall within the grievance procedure of § 7121, the same argument relied on in this case; as demonstrated here, this view is at odds with the statutory scheme of the Act. But even assuming that the result in *Local 1497* is correct,

withstand scrutiny. Congress provided that, except for § 7106(b), *nothing* in Chapter 71 shall affect management's authority, "in accordance with applicable laws," to make determinations with respect to contracting-out. To reach its conclusion that the whole grievance procedure is somehow excluded from that sweep, the majority must read the phrase "applicable laws" to include *the remainder of Chapter 71.* Thus, it in effect reads the statute as follows: "Nothing in this chapter [71], *EXCEPT ALL THE OTHER PROVISIONS OF CHAPTER 71, INCLUDING § 7121 (PRESCRIBING GRIEVANCE PROCEDURES)*, shall affect the authority of any management official of any agency ... to make determinations with respect to contracting out ..." (italicized matter supplied). It is absurd to construe the act to say that *"nothing"* in the rest of Chapter 71 affects management's right, but that the rest of Chapter 71 *does* affect that right. This construction is at variance with any reasonable interpretation of the statute. The majority points to nothing in the legislative history which indicates that specifically denominated, non-negotiable rights conferred on "management officials" were nevertheless to be subjected to grievance and arbitral review.

It may be that the majority is not reading the statute that broadly, that not *all* of the remainder of Chapter 71 falls under "applicable laws." It may, perhaps, be suggesting simply that Congress' (unarticulated) intent in § 7106(a) was to shield the decision-making process from *negotiation,* but not from *subsequent review* by

labor arbitrators and the FLRA. Again, there is no shred of legislative history which indicates that Congress intended contracting-out decisions to be grievable. But the intent of Congress can be inferred from what it wrote. It did *not* say that contracting-out decisions (and the other management rights) are "non-negotiable." Had it done so, grievance review arguably would still remain. Instead, it said that, except for § 7106(b), *nothing in Chapter 71 can affect the right of the agency to make contracting-out decisions.* The latter phrase would be singularly inept if what Congress meant was the former, and at least in the absence of clear Congressional intent or a manifestly unsound result this court should refrain from directly violating the express language adopted by Congress.

## C.

Next, even if we assume that (1) the term "applicable laws" *does* include all the rest of Chapter 71, and (2) the exercise of a non-negotiable management right *is* subject to the grievance provisions, it is far from clear that a failure to comply with Circular A–76 would meet the definition of a "grievance" for purposes of 5 U.S.C. § 7121.

The term "grievance" is defined *restrictively* by Congress in 5 U.S.C. § 7103(a)(9)(C)(ii), as here relevant, to *mean* [8] "any claimed violation, misinterpretation, or misapplication of any law, rule, or regulation *affecting conditions of employment"* (emphasis added).[9] The term "conditions of employment" is also restric-

it does not control this case. The assignment of work to employees in that case—unlike the decision to contract out in *this* case—arguably *does* have an impact on "working conditions," and hence might fall under the specific definition of "grievance" in § 7103(a)(9). *See* pages 857–858 *infra.*

8. A statute that defines a term with the phrase "to mean" is generally restrictive; "to include" is generally expansive. The majority's description of the term "conditions of employment" as "expansive," *see* Maj. at 845, is thus incorrect.

9. The majority also notes that the definition of "grievance" also includes "any matter relating to the employment of any employee," 5 U.S.C.

§ 7103(a)(9)(B), and then asserts that a violation of substantive contracting-out criteria "surely falls within this definition." Maj. at n. 18. But there is nothing "sure" about it. Again, the Authority has not made this claim and the majority offers no support. I note that under the majority's apparent reasoning, the *very decision to adopt a particular economic formula itself would be grievable,* because it might at some time in the future, if implemented, have some effect on employment. There is no indication that Congress intended such decisions to be subject to arbitral review.

tively defined to *mean* "personnel policies, practices, and matters ... affecting *working conditions.*" 5 U.S.C. § 7103(a)(14) (emphasis added). Thus, even under the majority's interpretation of the statute, a violation of agency regulations is a "grievance" under § 7103(a)(9)(C)(ii) *only* to the extent that such violation involves personnel policies and practices or the *working conditions* of the employees. These are plainly words of limitation—*i.e.*, not *all* violations are grievable—and there is *no* indication that such limitation was inserted inadvertently.

The majority's footnote suggestion that Circular A–76 may have something to do with personnel policies or practices is insubstantial.[10] It must, then, be fitted (if anywhere) under the phrase "matters ... affecting working conditions." But a contracting-out decision, even when it results in a loss of jobs, is not necessarily a decision affecting the *working conditions* of the employees. While ordinarily the term "working conditions" is to be broadly interpreted, *see Independent Federation of Flight Attendants v. Trans World Airlines, Inc.*, 655 F.2d 155, 157 (8th Cir.1981), it nevertheless "has a ... specific meaning in the language of industrial relations," *Corning Glass Works v. Brennan*, 417 U.S. 188, 202, 94 S.Ct. 2223, 2232, 41 L.Ed.2d 1 (1974), and clearly means "something less than the employment relation-

ship in its entirety." *Southern Railway Co. v. OSHRC*, 539 F.2d 335, 339 (4th Cir.), *cert. denied*, 429 U.S. 999, 97 S.Ct. 525, 50 L.Ed.2d 609 (1976). In interpreting the same term in another statute, the Supreme Court explained that "the element of working conditions encompasses two subfactors: 'surroundings' and 'hazards.'" *Corning Glass, supra*, 417 U.S. at 202, 94 S.Ct. at 2232 (interpreting the Equal Pay Act). This court subsequently noted that *only* "surroundings" and "hazards" fall within the labor relations meaning of "working conditions," *Laffey v. Northwest Airlines, Inc.*, 567 F.2d 429, 452 n. 153 (D.C.Cir. 1976), and in the FLRA we are dealing with a "labor relations" act. With reference to the term "working conditions" in yet another act, other circuits have held that the term refers to the "environmental area in which an employee customarily goes about his daily tasks." *Columbia Gas of Pennsylvania, Inc. v. Marshall*, 636 F.2d 913, 916 (3d Cir.1980); *Southern Railway, supra*, 539 F.2d at 339. There is no indication that the term "working conditions" in the statute at issue here (which was used by Congress several years after the *Corning Glass* decision, presumably with knowledge of the meaning assigned to those words by the Court) was intended to have a different, much broader meaning than it enjoys in other labor relations statutes passed by Congress.[11]

---

**10.** The majority asserts that even if the Supreme Court's interpretation of "working conditions" (*see infra*) applies, failure to comply with the Circular's substantive economic guidelines for making contracting-out decisions would nevertheless "undoubtedly fall under the umbrella of personnel policies or practices." Not even the Authority in this case has suggested that substantive contracting-out criteria are transmuted into "personnel policies or practices" by virtue of the fact that they may at some point have some sort of impact on the continued employment of particular employees. Not surprisingly, the majority offers no support whatever for this extraordinarily broad reading. Had Congress intended the term "conditions of employment" to include "anything which has or may at some time in the future have an impact on the employment of an employee," it could easily have said so. It did not.

**11.** The majority relies on *Department of Defense v. FLRA*, 685 F.2d 641 (D.C.Cir.1982), as sanctioning a "broad" construction of the phrase "conditions of employment" in the Act. That case, however, involved union proposals relating to (1) registration of employee automobiles, and (2) provision of certain consumer goods to employees in overseas post exchanges. Both provisions fall clearly within the scope of personnel practices and procedures, and neither even remotely interferes with any reserved management right.

I am unpersuaded by the majority's flat assertion—it is nothing more—that Congress' definition of "working conditions" in one statute simply "does not apply" in another statute. Noting that Congress did not elaborate on its definition in the statute's legislative history, the majority just presumes that it must have meant something different in this statute than it meant when it used the identical phrase in other stat-

It might be argued, on analogy to the National Labor Relations Act (NLRA), that contracting-out decisions *do* fall within the term "conditions of employment." In one NLRA case, *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 210, 85 S.Ct. 398, 402, 13 L.Ed.2d 233 (1964), the Supreme Court interpreted the term—which is *not* defined in the NLRA—to include contracting-out. However, in the Federal Labor Relations Act, unlike the NLRA, Congress—which presumably was aware of both *Fibreboard Paper* and *Corning Glass* —chose to define the term *strictly* in a much narrower fashion: it means *only* personnel policies and practices and matters affecting "working conditions." The meaning attached to a term in one statute, where Congress has not defined it, is irrelevant to its meaning in another statute where Congress *has* defined it. It is the phrase *working conditions*, not *conditions of employment*, which acts to narrow the scope of grievances under the FLRA.[12]

Since a violation of the regulation involved in this case would be grievable only to the extent it affected the environmental conditions under which employees work, it is difficult to see what sort of violation of Circular A–76 could have any effect on the *working conditions* —as opposed to the continued employment—of the bargaining unit employees. The Circular governs decisions regarding *when* agencies should contract out; it does not specify the internal agency personnel policies which would implement such decisions. It conceivably could result in the termination of an employee, but would have little or no effect on *conditions* in the workplace.

## D.

The FLRA itself apparently recognizes that some claimed violations of the Circular will turn out to be non-grievable, but insists that *each claimed violation* must in the first instance go to an arbitrator.[13] Under that approach, the arbitrator would decide whether or not the violation is grievable, subject to FLRA review.[14] The FLRA has flatly refused to supply any guidance as to which parts (if any) of the Circular it thinks might be grievable. The EEOC sought such guidance in its petition for reconsideration,[15] but the FLRA, finding that the request presented no "extraordina-

utes. But the most plausible explanation for the lack of discussion in the legislative materials is that Congress assumed that its use of the words "working conditions"—words that it had used previously and which the Supreme Court recognized have a definite, specialized meaning in the labor relations field—made it unnecessary to waste additional pages of its committee reports illuminating the obvious.

**12.** I must note that, contrary to the majority's assertion, I do *not* "maintain[ ] that grievances are restricted to claims involving surroundings and hazards." *See* Maj. at n. 18. On the contrary, the statute at issue requires bargaining over (1) "personnel policies," and (2) personnel "practices," as well as (3) "matters ... affecting working conditions." 5 U.S.C. § 7103(a)(14).

**13.** That would, as pointed out *supra,* submit each work project contracted out to *mandatory* negotiation, in violation of the purely elective negotiation provided for in § 7106(b)(1).

**14.** FLRA review of an arbitrator's decision is very similar to judicial review of ordinary arbitral awards. It may set aside an award only on two grounds: "(1) because it is contrary to any law, rule, or regulation; or (2) on other grounds

similar to those applied by Federal courts in private sector labor-management relations." 5 U.S.C. § 7122(a). Thus, the majority's construction assures that *every* managerial decision with respect to "contracting out," if questioned, would ultimately be made, not by the agency, but by the arbitrator *practically free of any real review.*

**15.** The EEOC explained its request for clarification in its letter requesting reconsideration:

> For example, OMB Circular A–76 and other applicable laws and regulations concerning contracting out contain procedures for the guidance of management in the technical aspects of contracting out which do not directly affect conditions of employment ....
> [I]t seems clear to us that the Union proposal at issue, is not, *on its face,* limited to conditions of employment .... Since the EEOC has many contracts with no direct or indirect impact on conditions of employment of bargaining unit members, we are asking the FLRA to explain in what fashion OMB Circular A–76 and other applicable laws and regulations concerning contracting out fall within the ambit·of the scope of bargaining and grievance resolution machinery under the Statute.

ry circumstances," curtly denied it.[16] Hence, under the FLRA's construction, *every alleged violation of the Circular, the basic purpose of which is to provide SUB-STANTIVE guidance for management decisions regarding contracting-out, must go to an arbitrator.*

The FLRA's cavalier, conclusory treatment of the EEOC's legitimate request can be seen as an implicit admission that disclosure of the parts it considers *might* be grievable would amount to such an extreme denial of elementary managerial authority as to make it perfectly obvious that its construction is a plain violation of the intent expressed by Congress. The same conclusion can be reached with respect to the construction adopted by the majority here. The majority's construction assures that *every* managerial decision with respect to "contracting-out," if questioned, will ultimately be made, not by the agency, but by an arbitrator, subject to very limited review. This results in a complete negation of the intent expressed by Congress.

This interpretation of the grievance procedure offers the union a fertile source of weapons for obstructing or delaying contracting-out decisions, a situation Congress specifically sought to prevent. It is not difficult to visualize what will happen. The union can file a grievance, claiming that one of the technical standards of the Circular (wholly unrelated to working conditions) was not complied with. The claim as to that particular project must go to an arbitrator, who on a case-by-case basis will evaluate it. Assuming that the arbitrator correctly follows the law, the grievance will be denied. The union then will file exceptions to the award with the FLRA, and months—or, drawing on the experience of the National Labor Relations Board, even *years*—later, the FLRA may deny the exceptions. Review in the court of appeals may follow.[17]

Even if the grievance is eventually denied, and that denial is affirmed, the prolonged litigation will have cast a cloud over the agency's contracting-out decision, subjected the decision to considerable delay, and wasted valuable agency assets on an essentially frivolous claim. This extraordinary potential for vexatious litigation will significantly infringe upon management's specifically designated right to make contracting-out decisions.[18] The majority's

**16.** The Authority finds that such a request does not establish "extraordinary circumstances" warranting reconsideration as required under section 2429.17 of the Authority's Rules and Regulations. Rather, the Agency in essence is asking the Authority to make arbitrability determinations in the absence of a specific factual context. To the extent that an arbitrability question may arise in the future, the Agency may, of course, avail itself of the procedures set forth in section 7121 of the Statute for the resolution of such questions. AFGE, Nat'l Council of EEOC Locals, 10 F.L.R.A. No. 1 (Mar. 18, 1983) (footnote omitted) (order denying reconsideration).

**17.** Review in the court of appeals is governed by 5 U.S.C. § 7123(a), which grants review to:

[a]ny person aggrieved by any final order of the Authority *other than an order under* — (1) *section 7122 of this title (involving an award by an arbitrator),* unless the order involves an unfair labor practice under section 7118 of this title . . . .

(Emphasis added.) Thus, Congress specifically has removed FLRA actions approving or disapproving most arbitral awards from direct judicial review. (Judicial review may still be available if the FLRA seeks judicial enforcement under 5 U.S.C. § 7123(b).) Without doubting the good faith of the FLRA, I note that should it later attempt to thwart the will of Congress by whittling away specifically reserved management rights through the use of case-by-case arbitration, there may be little the courts can do to correct it. The FLRA's policy of forcing all alleged violations—whether ultimately found grievable or not—to go to an arbitrator in the first instance may effectively shield future decisions plainly inconsistent with the will of Congress.

**18.** The EEOC in its brief explains the possible consequences of this kind of substantive review:

[A]n EEOC employee could challenge the agency's contracting-out decision by arguing that the underlying comparative cost analysis [one of the standards set forth in the Circular] was flawed. If the issue went to arbitration, an arbitrator could decide that the analysis was inadequate under the [Circular's] guidelines ... and therefore did not justify the Agency's conclusion that the commercial activity in question could be performed most inexpensively by a private source. The ultimate result could be a ruling sustaining the employee's claim, and requiring the EEOC to

construction thus fails to comply with Congress' admonition that Chapter 71 "be interpreted in a manner consistent with the requirement of an effective and efficient government." 5 U.S.C. § 7101(b).

## IV. CONCLUSION

All of the above was recognized by the union; its apparent goal was to incorporate *substantive* contracting-out criteria (over which neither it nor management may bargain), into the collective bargaining agreement, which would make them grievable and hence would subject them to arbitral review. The union's pursuit of this case is utterly inexplicable on any other basis.[19] Yet the FLRA and the majority hold that contracting out and the other reserved rights *already* are covered by the grievance mechanism, and that the processes and criteria used by an agency in making contracting-out determinations must be reviewed by arbitrators and the FLRA through that mechanism. For the reasons set forth above, it is my view that such holding is completely contrary to the language of the applicable statutes, drastically undercuts the specific statutory right of management to contract out, and effectively guts the specific reserved limitations that Congress placed on the agency's duty to bargain and the authority of the FLRA.

I accordingly dissent.

reconsider its contracting-out determinations after conducting another comparative cost analysis.

Reply Brief for Petitioner at 3–4. Under the majority's construction of the statute, avoidance of this scenario depends greatly on the good faith of the FLRA in subsequently holding such direct review of substantive decisions to be nongrievable. There is, however, nothing in the decision under review which rules out the possibility that the FLRA may wind up reviewing all such determinations in grievance proceedings.

19. If, as the majority claims, it is entirely obvious from the statute that violations of the Circu-

lar are already grievable as a matter of law, why would the union waste its time, effort, and money in pursuing first the contract proposal and now this action? Even if the EEOC eventually agrees to the proposal—which would contradict the intent of Congress and which, even under the majority's construction, the agency obviously is not required to do—the union's remedies for violations of the Circular are, under the majority's construction, exactly the same. It seems absurd to talk of "bargaining" over a proposal which the majority believes will impose no cost on the agency and confer no benefit on the employees.