801 F.2d 1120
 8 Fed.R.Serv.3d 822
 FUNBUS SYSTEMS, INC., Plaintiff-Appellant,
v.
STATE OF CALIFORNIA PUBLIC UTILITIES COMMISSION, Defendant-Appellee,
Airport Service, Inc., Real Party In Interest.
Interstate Commerce Commission, Applicant for
Intervention-Appellant.
FUNBUS SYSTEMS, INC., Plaintiff-Appellant,
v.
STATE OF CALIFORNIA PUBLIC UTILITIES COMMISSION, Defendant-Appellee,
Airport Service, Inc., Real Party In Interest.
Interstate Commerce Commission, Applicant for
Intervention-Appellant.
AIRPORT SERVICE, INCORPORATED, Petitioner,
State of California and Public Utilities Commission of the
State of California, Intervenors-Petitioners,
v.
INTERSTATE COMMERCE COMMISSION, Respondent,
Funbus Systems, Inc., Real Party-Intervenor.
AIRPORT SERVICE, INCORPORATED, Petitioner,
State of California and Public Utilities Commission of the
State of California, Intervenors-Petitioners,
v.
INTERSTATE COMMERCE COMMISSION, Respondent,
Lounge Car Tours Charter Company, Inc., Real Party-Intervenor.
 Nos. 84-6170, 84-6171, 85-7104 and 85-7105.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 7, 1986.
Sept. 30, 1986.
 
 Menke, Fahrney & Carroll, Dennis V. Menke, Orange, Cal., for Funbus system.
 Kenneth O. Eikenberry, Atty. Gen., Robert Daniel Cedarbaum, Asst. Atty. Gen., Olympia, Wash., amicus curiae.
 Janice E. Kerr, J. Calvin Simpson, Gretchen Dumas, Harvey Y. Morris, San Francisco, Cal., for Cal. Public Utilities Com'n.
 
 
 1
 Robert S. Burk, Gen. Counsel, Henri F. Rush, Dep. Gen. Counsel, H. Glenn Scammel, Atty., I.C.C., Washington, D.C., for I.C.C.
 
 
 2
 J. Terence Lyons, Lyons & Lyons, Los Angeles, Cal., for Real Party in Interest.
 
 
 3
 John C. Russell, Russell & Hancock, Los Angeles, Cal., for Real Party-Intervenor.
 
 
 4
 Masha Rozman, Asst. Atty. Gen., Trenton, N.J., for State of New Jersey & New Jersey Dept. of Transp.
 
 
 5
 Allan Kohler, Atty., Harrisburgh, Pa., for the Public Utility Com'n of the Commonwealth of Pennsylvania.
 
 
 6
 Paul Rodgers, Gen. Counsel, Charles D. Gray, Asst. Gen. Counsel, Genevieve Morelli, Dep. Asst. Gen. Counsel, National Ass'n of Regulatory Utility Commissioners, Washington, D.C., for The National Asso. of Regulatory Utility Comm.
 
 
 7
 Appeal from the United States District Court for the Central District of California; Nos. 84-6170, 84-6171.
 
 
 8
 Petition to Review a Decision of the Interstate Commerce Commission; Nos. 85-7104, 85-7105.
 
 
 9
 Before KENNEDY, SKOPIL and ALARCON, Circuit Judges.
 
 ALARCON, Circuit Judge:
 
 10
 These consolidated cases present a common novel issue: Does section 6 of the Bus Regulatory Reform Act, 49 U.S.C. Sec. 10922 (partial rev. 1985) (hereinafter Bus Act) authorize the Interstate Commerce Commission (hereinafter ICC) to issue certificates permitting motor carriers to conduct intrastate services which operate independently of their interstate operations?
 
 
 11
 In appeal nos. 85-7104 and 85-7105, petitioner Airport Service, Inc. (hereinafter ASI) seeks review of two final orders of the ICC: the first (no. 85-7104) on Funbus Systems, Inc.'s (hereinafter Funbus) and the California Public Utilities Commission's (hereinafter CPUC) petitions for a declaratory order regarding the propriety of Funbus' intrastate airporter operations under a previously issued ICC certificate (in which proceedings ASI was granted leave to intervene); and the second (no. 85-7105) on the ICC's denial of ASI's protest against Lounge Car Tours Charter Co., Inc.'s (hereinafter Lounge Car) application for operating authority to conduct intrastate operations from Los Angeles International Airport (hereinafter LAX) to Anaheim. The State of California and the CPUC join as intervenors in ASI's petitions for review.
 
 
 12
 Amicus briefs were filed in nos. 85-7104 and 85-7105 by (1) the State of Washington and the Washington Utilities and Transportation Commission (hereinafter Washington), and (2) the State of New Jersey and the New Jersey Department of Transportation, the Public Utility Commission of the Commonwealth of Pennsylvania and the National Association of Regulatory Utility Commissioners (hereinafter NARUC) (hereinafter collectively referred to as joint amici). The United States filed a position statement.
 
 
 13
 In appeal nos. 84-6170 and 84-6171, Funbus and the ICC appeal from the district court's dismissal of Funbus' complaint to enjoin the CPUC from interfering with Funbus' intrastate bus operations conducted under the authority of a certificate of public convenience and necessity issued by the ICC, and to grant declaratory relief. ASI opposes the appeal as the real party in interest. Funbus and the ICC also appeal from the district court's ruling that the ICC's motion to intervene was moot.
 
 
 14
 We conclude that the Bus Act requires a showing of a connection between proposed intrastate services and pre-existing or simultaneously approved interstate services which are or will be in actual operation as a prerequisite to a grant of operating authority by the ICC for intrastate services. Therefore, we reverse the ICC's determinations in the matters of the certificates issued to Funbus and Lounge Car. In light of our decision, we remand the cases for further factual findings. Because appellants in the related district court action have already obtained the relief sought in that case and because our resolution of the statutory interpretation issue renders repetition unlikely, we dismiss the appeals from the district court action as moot.
 
 I. BACKGROUND FACTS AND PROCEDURAL HISTORY
 
 15
 For the past 25 years, ASI has operated an intrastate airport shuttle service from LAX to various points in Orange County, California, pursuant to a certificate issued by the CPUC. In March of 1984, Funbus began operating a bus service between LAX and two Orange County cities: Anaheim, California, and Buena Park, California. Funbus also offers interstate service from Southern California to Las Vegas, Nevada. Funbus' operations are conducted pursuant to a certificate of operating authority issued by the ICC; Funbus did not apply for a certificate from the CPUC.
 
 
 16
 On April 17, 1984, ASI filed an action with the CPUC for an immediate cease and desist order preventing Funbus from continuing its intrastate services because it had failed to comply with CPUC certification procedures. (Airport Services, Inc. v. Funbus Systems, Inc., CPUC No. 84-04-068). On April 18, 1984, the CPUC issued an ex parte interim cease and desist order and calendared the matter for a full hearing for April 30, 1984. The hearing before the CPUC did not take place on April 30 because Funbus attempted to remove the case to the district court. After allowing the ICC to intervene in the proceedings, the district court remanded the action to the CPUC.
 
 
 17
 The CPUC hearings on ASI's complaint for a cease and desist order were held on June 13 and 14, 1984. On June 20, 1984, without conceding that it lacked jurisdiction, the CPUC issued an interim opinion directing its General Counsel to seek an opinion from the ICC concerning the extent of the operations authorized by Funbus' certificate of public convenience and necessity, and suspending the cease and desist order. The CPUC's opinion stated that a decision on the merits would be rendered after receipt of the ICC's opinion. Funbus has continued to operate its intrastate services throughout these proceedings.
 
 
 18
 A. District Court Proceedings (Appeal Nos. 84-6170 and
 
 84-6171)
 
 19
 On April 24, 1984, Funbus filed an action for declaratory and injunctive relief in the district court, and an ex parte request for a temporary restraining order (hereinafter TRO) enjoining the CPUC proceedings. The district court denied the request for a TRO and scheduled a hearing on the motion for a preliminary injunction. On May 16, 1984, ASI moved to dismiss Funbus' complaint in the district court, and on May 17, 1984, the ICC moved to intervene in the district court action. The district court issued a decision on June 19, 1984, dismissing Funbus' complaint and ruling that in light of the dismissal, the ICC's motion to intervene was moot. Funbus and the ICC appeal from the district court's rulings in case nos. 84-6170 and 84-6171, respectively. By order dated September 24, 1984, this court denied the ICC's motion to intervene in Funbus' appeal.
 
 
 20
 B. ICC Proceedings (Appeal Nos. 85-7104 and 85-7105)
 
 
 21
 On May 8, 1984, Funbus filed a complaint with the ICC seeking vacation of the CPUC's cease and desist order and dismissal of ASI's complaint against Funbus, then pending before the CPUC. On July 6th, the CPUC's General Counsel requested an opinion from the ICC concerning the scope of the intrastate operating authority granted to Funbus under its ICC certificate. The ICC consolidated Funbus' complaint with the CPUC's request for an opinion and issued a declaratory ruling on December 28, 1984. Funbus Systems, Inc., 133 M.C.C. 406 (1984). The ICC determined that the Bus Act preempted state jurisdiction to certify intrastate transportation conducted on interstate routes, and found that the ICC had exclusive jurisdiction to determine whether Funbus, an ICC-certified carrier, was operating within the scope of its certificate. Id. at 414-15. The ICC determined that the Bus Act does not require the actual conduct of interstate operations over a route in order to support an application for intrastate authority over that route, and stated that its rules therefore do not require a carrier seeking intrastate operating authority to certify the extent to which intrastate operations are or will be conducted over an interstate route. Id. at 423-24. The ICC summarized:
 
 
 22
 Thus, while intrastate authority may be granted only over an underlying interstate route, an applicant to obtain it need show only that it holds authority to provide interstate transportation over the underlying route, and not that it performs such services.... The intrastate rights are not authorized incidental to, or supplementary of, interstate regular-route operations, so there need not be a "mutuality" between the two.
 
 
 23
 Id. at 424. The ICC concluded that Funbus had authority under its ICC certificate to operate the LAX-Anaheim-Buena Park route. Id. at 425-27. The ICC further determined that Funbus' operations were not in the nature of "special operations" nor were they "incidental to air transportation," so as to divest the ICC of jurisdiction to issue a certificate covering the operations. Id. at 421-22. ASI and the CPUC appeal from the ICC's ruling. (Appeal no. 85-7104).
 
 
 24
 Appeal no. 85-7105 began with Lounge Car's application to the ICC for authority to conduct both intrastate and interstate operations. ASI protested and sought an evidentiary hearing. On July 13, 1984, the ICC denied ASI's protests without granting an evidentiary hearing. Lounge Car's application was granted by the ICC's review board, with the stipulation that Lounge Car not operate a service to or from LAX that is incidental to transportation by air. On December 11, 1984, the ICC's administrative appeals board affirmed the granting of the application, and removed the incidental to air restriction on the service. ASI's petition for review by the entire Commission was denied, and Lounge Car began operating a service from LAX to Anaheim. ASI seeks review of the ICC's decision. (Appeal no. 85-7105). In November of 1984, after Lounge Car had begun operations, ASI filed an action with the ICC asserting that the Lounge Car application and bus service were a sham disguised to circumvent state regulation. (Airport Services, Inc. v. Lounge Car Tours Charter Co., ICC No. MC-C 10943). That proceeding is dormant pending the outcome of this appeal.
 
 II. JURISDICTION
 
 25
 A. Petitions for Review of ICC Decisions (Nos. 85-7104 and
 
 85-7105)
 
 26
 We have jurisdiction to review final orders of the ICC under 28 U.S.C. Sec. 2342(5) (1982). In appeal no. 85-7104, ASI seeks review of an ICC order entered January 8, 1985. The petition for review was timely filed on February 25, 1985, well within 60 days of the entry of the ICC order. See 28 U.S.C. Sec. 2344 (1982).
 
 
 27
 In appeal no. 85-7105, ASI seeks review of an ICC order entered December 26, 1984. The ICC argues that the petition for review in that case was not filed until the 61st day--Monday, February 25, 1985--and thus was untimely. This argument is meritless.
 
 
 28
 Fed.R.App.P. 26(a) extends the period for timely filing of a notice of appeal where the last day for timely filing falls on a weekend or holiday. Rule 26(a) is applicable to appellate review of agency orders. Fed.R.App.P. 20; Miller v. United States Postal Service, 685 F.2d 148, 149 (5th Cir.1982), cert. denied, 461 U.S. 916, 103 S.Ct. 1898, 77 L.Ed.2d 286 (1983). Because the last day for the timely filing of appeal no. 85-7105 fell on a Sunday, Fed.R.App.P. 26(a) applies to extend the filing period until Monday, February 25, 1985. The appeal is timely.
 
 
 29
 B. Appeals from District Court Decisions (Nos. 84-6170 and
 
 85-6171)
 
 30
 ASI and the CPUC argue that Funbus' appeal and the ICC's appeal are untimely; that the district court's ruling was not a decision on the motion to intervene and thus was not a final, appealable order; and that the ICC lacks standing to bring this appeal because it was never made a party to the district court action. Funbus claims that even if its appeal is untimely, the appeal is at worst premature because the district court failed to enter a judgment as required by Fed.R.Civ.P. 58. We do not reach these questions because, as discussed infra, Part IV, we dismiss as moot the appeals from the district court rulings.
 
 
 31
 III. PROPRIETY OF AMICI BRIEFING IN APPEAL NOS. 85-7104 AND 85-7105
 
 
 32
 The ICC urges us to exercise caution in considering the arguments of the amici because of the amici's direct interest in the outcome of this litigation: the preservation of their bureaucratic regulatory power. The ICC argues that a true amicus is one who gives information of some matter of law for the assistance of the court, rather than one who gives a "highly partisan ... account of the facts." New England Patriots Football Club, Inc. v. University of Colorado, 592 F.2d 1196, 1198 n. 3 (1st Cir.1979). We find the ICC's warning inapposite. These amici do not present "highly partisan ... account[s] of the facts," or indeed, any account of the facts; they take a legal position and present legal arguments in support of it, a perfectly permissible role for an amicus. See Miller-Wohl Co. v. Commissioner of Labor & Industry, 694 F.2d 203, 204 (9th Cir.1982) (amici fulfill the classic role of amicus curiae by assisting in a case of general public interest, supplementing the assisting in a case of general public interest, supplementing the efforts of counsel, and drawing the court's attention to law that might otherwise escape consideration). Moreover, we have stated that there is no rule that amici must be totally disinterested. See Hoptowit v. Ray, 682 F.2d 1237, 1260 (9th Cir.1982).
 
 
 33
 The ICC also moves to strike Washington's recitation of the facts in Evergreen Trails, Inc., No. MC-107638 (Sub-No. 10). The ICC's contention that Washington's presentation of such facts is jurisdictionally precluded because no judicial review of that license was sought, misses the mark. Washington does not seek to obtain judicial review of the Evergreen decision in this proceeding. Instead it has presented the facts of that matter, which it contends presents issues identical to those raised by the instant case, "[i]n order for this court to be fully advised as to the substantial interests of the State of Washington and the WUTC [Washington Utilities and Transportation Commission] in these proceedings." Amicus Curiae Brief for Washington at 4. Similarly, the ICC's assertion that Washington's use of extra-record facts is improper because an amicus may not raise an issue of fact in an appeal is misdirected. Washington does not seek to raise issues of fact, nor does it raise any legal question not urged by the parties themselves. Therefore, the ICC's motion to strike Washington's argument is denied.
 
 
 34
 Finally, the ICC attacks NARUC's attempt to participate as an amicus without leave of court. See Fed.R.App.P. 29. The ICC asks the court to "make it clear that NARUC's conduct will not be condoned, and that NARUC is not before the Court." Brief of Respondent ICC at 16 n. 10. While the ICC is technically correct and NARUC is not properly before this court, NARUC's only apparent participation in this case was as a co-signator on the joint brief of amici filed by Pennsylvania and New Jersey, whose participation is not challenged. Thus, the joint brief and the arguments made therein are properly before us.
 
 
 35
 IV. ICC AUTHORITY TO REGULATE MOTOR CARRIERS' INTRASTATE OPERATIONS
 
 
 36
 We may set aside an agency's ruling if the agency's findings or conclusions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" or "unsupported by substantial evidence." 5 U.S.C. Sec. 706(2)(A), (C), (E) (1982).
 
 
 37
 The dispositive issue in appeal nos. 85-7104 and 85-7105 is whether section 10922(c)(2)(B) of the Bus Act authorizes the ICC to issue certificates approving intrastate motor carrier services which are conducted independent of interstate services. The ICC ruled that section 10922(c)(2)(B) of the Bus Act does not require the actual conduct of interstate operations over a route in order to support an application for intrastate authority over that route. 133 M.C.C. at 424. In the ICC's view, "[t]he exact nature and extent of a carrier's existing or proposed operations over an interstate route is not a factor in determining an intrastate request for authority, so long as the carrier holds or will hold authority to perform over the route in a regular-route operation." Lounge Car Tours Charter Co., No. MC-153325 (ICC Dec. 10, 1984) (unpublished decision). ASI and the CPUC contend that the Bus Act does not preempt state authority to regulate intrastate routes which have no relationship to interstate routes.
 
 
 38
 "In construing a statute in a case of first impression, we look to the traditional signposts of statutory construction: first, the language of the statute itself; second, its legislative history, and as an aid in interpreting Congress' intent, the interpretation given to it by its administering agency." Brock v. Writers Guild of America, West, Inc., 762 F.2d 1349, 1353 (9th Cir.1985) (citations omitted).
 
 
 39
 A. The Plain Language of Section 10922(c)(2)(B)
 
 
 40
 In reviewing an ICC decision which purports to interpret a statute, we focus first on the statute's plain language. Hudson Transit Lines, Inc. v. United States I.C.C., 765 F.2d 329, 341 (2d Cir.1985); see Brock v. Writers Guild of America, West, Inc., 762 F.2d at 1353. Section 10922(c)(2)(B) provides:
 
 
 41
 The Commission shall issue a certificate to a person authorizing that person to provide regular-route transportation entirely in one State as a motor common carrier of passengers if such intrastate transportation is to be provided on a route over which the carrier has been granted authority, or will be granted authority, after the effective date of this section to provide interstate transportation of passengers....
 
 
 42
 (emphasis added).
 
 
 43
 ASI and the CPUC argue that the phrase "provided on a route" is ambiguous, and that if Congress had intended to preempt state authority to regulate purely intrastate operations, it would have said so. We agree. The ICC's construction of the statute would effectively preempt state authority over the initiation of new intrastate bus operations, a field traditionally occupied by the states. See, e.g., Cal.Pub.Util.Code Secs. 1031-1040 (West 1975 & Supp.1986) (requiring common carriers operating on California state highways to obtain a certificate of public convenience and necessity from the CPUC). Therefore, we must " 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' " Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Commission, 461 U.S. 190, 206, 103 S.Ct. 1713, 1723, 75 L.Ed.2d 752 (1983) (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)).
 
 
 44
 We are persuaded that the phrase "provided on a route" in section 10922(c)(2)(B) is not such "explicit pre-emptive language" as to end our inquiry with the language of the statute. See Pacific Gas & Electric Co., 461 U.S. at 203, 103 S.Ct. at 1721. Therefore, we turn to the legislative history for aid in ascertaining Congress' intent. See Lewis v. Hegstrom, 767 F.2d 1371, 1376 (9th Cir.1985).
 
 B. Congressional Intent
 
 45
 Because the ICC is charged with the duty to administer the Bus Act, its interpretation of the Act is entitled to considerable deference unless it is contrary to the clear aim of Congress. Hudson Transit Lines, 765 F.2d at 341-42. The judiciary is the final authority on issues of statutory construction, however, and must reject administrative constructions which are contrary to clear Congressional intent or which frustrate the policy which Congress sought to implement. Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 2782 n. 9, 81 L.Ed.2d 694 (1984); accord Southern California Edison Co. v. FERC, 770 F.2d 779, 782 (9th Cir.1985); United States v. Louisiana-Pacific Corp., 754 F.2d 1445, 1447 (9th Cir.1985). "If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." Chevron, 467 U.S. at 843, 104 S.Ct. at 2782.
 
 
 46
 The Bus Act was intended to strengthen the bus industry in interstate commerce by lessening unreasonable burdens imposed by state entry barriers. S.Rep. No. 411, 97th Cong., 2d Sess. 7-8, reprinted in 1982 U.S.Code Cong. & Ad.News 2308, 2314-15. The Senate Committee on Commerce, Science and Transportation noted that regular route passenger miles had declined substantially on interstate bus routes under ICC jurisdiction because state regulatory schemes prohibited discontinuance of many unprofitable intrastate routes forcing carriers to raise rates for interstate travelers in order to subsidize the low prices paid by intrastate travelers. Id. at 8, 1982 U.S.Code Cong. & Ad.News at 2315. The new Act was designed to promote increased price and service competition by decreasing burdensome regulation. Id. at 13, 1982 U.S.Code Cong. & Ad.News at 2320.
 
 
 47
 The Bus Act, however, was not intended to accomplish the total deregulation and preemption of state authority, but instead to effect a case-by-case preemption which was a compromise between the desires of industry and those of the states. See 127 Cong.Rec. 28,180 (1981) (statement of co-sponsor Rep. Schuster) ("This is a far cry from deregulation. In fact, this is a far cry from the extent to which Federal preemption was provided in the airline regulatory reform bill."); id. at 28,178 (statement of Rep. Clausen) ("[T]he limited, case-by-case preemption in H.R. 3663 does not go as far as most witnesses that appeared before the committee wanted. Industry, obviously, wanted total preemption."); id. at 28,175 (statement of Rep. Howard) ("This bill ... is regulatory reform and not total deregulation.").[1] With specific regard to the entry provisions in section 10922(c)(2)(B), the jurisdiction afforded to the ICC to issue intrastate certificates governing interstate operations was
 
 
 48
 not intended to reach beyond the point necessary to enhance the competitiveness of interstate carriers moving pursuant to interstate certificates. While the states might justifiably consider removing closed door restrictions on solely intrastate traffic not along an interstate route, this matter has been left to them, and for that reason, [the entry provision] does not totally preempt closed door restrictions.
 
 
 49
 H.R.Rep. No. 334, 97th Cong., 1st Sess. 34 (1981) (emphasis added).
 
 
 50
 Congress made clear that the Bus Act was designed to ease entry standards for those carriers actually operating interstate routes. In explaining the impact of section 10922(c)(2)(A) and (B), the Committee stated:
 
 
 51
 The bill also substantially eases intrastate entry for interstate carriers. Sections (2)(A) and (B) are intended to remove the problem of "closed door" intrastate policies on interstate operations. Historically, some States have refused to authorize carriers to provide service between points in that State as part of an interstate operation being conducted between those two points and points beyond.... [S]uch closed door policies are contrary to the policies of the act favoring increased competition and improved operational and energy efficiency.
 
 
 52
 S.Rep. No. 411, 97th Cong.2d Sess. at 16, reprinted in 1982 U.S.Code Cong. & Ad.News at 2323 (emphasis added).
 
 
 53
 Implicit in Congress' explanation was the assumption that there would be a connection between the interstate services actually in operation and the intrastate portions of a route over which the ICC would have jurisdiction. For example, the Committee noted that state regulatory restrictions on "[a]n individual bus moving in interstate commerce [which] often will pick up and carry many passengers who are strictly intrastate" imposed an unreasonable burden on interstate commerce and must be preempted. Id. at 7-8, 1982 U.S.Code Cong. & Ad.News at 2314-15. Representative Anderson, the co-sponsor of H.R. 3663, stated during the debates that "[i]f a State decision pertains only to intrastate transportation, the State has the final authority. The ICC may only be involved in those matters that are interstate in nature, including intrastate segments of interstate routes." 127 Cong.Rec. 28,185 (1981) (emphasis added).[2]
 
 
 54
 The exit provisions of the Bus Act provide further support for the CPUC's contention that the entry provisions of the Bus Act require a nexus between a carrier's intrastate and interstate operations as a predicate to exercise of the ICC's jurisdiction over the intrastate operations. In an effort to override onerous state regulations which obligated carriers to continue to provide intrastate service even when they had been permitted to discontinue related interstate operations, Congress provided that the ICC could permit discontinuance of an intrastate route, but only if the ICC has granted or will grant authority to discontinue the interstate portion of the service. 49 U.S.C. Sec. 10935 (1982); S.Rep. No. 411, 97th Cong.2d Sess. at 25-26, 1982 U.S.Code Cong. & Ad.News at 2332-33.
 
 
 55
 Again, implicit in the Senate Committee's analysis of the exit provisions is the assumption that the carrier is actually providing interstate service, and that the interstate and intrastate portions of the route will be closely related. The Senate Report states:
 
 
 56
 The exit policy of the [Bus Act] is grounded on the premise that interstate carriers should be permitted to discontinue service over routes that do not cover their variable costs. If easier exit were not assured, the Congressional policy of providing for freer entry would be frustrated. In most cases, transportation of intrastate and interstate passengers in the same bus is required for a successful operation.
 
 
 57
 Id. at 25-26, 1982 U.S.Code Cong. & Ad.News at 2332-33 (emphasis added). Further, the Report specifically defines the limits of the ICC's certification authority:
 
 
 58
 If the ICC finds that continuing the [intrastate] transportation is not an unreasonable burden on interstate commerce, it is not authorized to preempt the State decision. In this situation, the carrier would have to continue providing the intrastate service as required by the State.
 
 
 59
 Id. at 27, 1982 U.S.Code Cong. & Ad.News at 2334.
 
 
 60
 Finally, as the D.C. Circuit pointed out when it analyzed the extent of deregulation accomplished by section 7 of the Bus Act in Trailways, Inc. v. ICC, 727 F.2d 1284, 1288 (D.C.Cir.1984), the legislative history makes clear that Congress intended itself to establish the compromise between total deregulation and case-by-case preemption, and did not intend to leave that judgment to the ICC. The court stated:
 
 
 61
 [A]ll evidence indicates that Congress thought it was delineating for itself the scope of deregulation, which was the primary issue it faced in considering [the Bus Act]....
 
 
 62
 Given Congress' focus on the extent of deregulation and on the precise structure of the new regulatory scheme, we do not believe that Congress intended to delegate to the Commission any significant responsibility to decide the bounds of its own power in deregulating the industry.... [B]ecause this case raises issues concerning the scope of deregulation and the structure of the regulatory scheme for which there is no evidence of intended congressional delegation to the Commission, we believe that it is for the courts to resolve questions about the content of the decisions Congress made. Although the agency's opinion on this point is useful, we do not accord it controlling weight.
 
 
 63
 Id.; see also Vanguard Interstate Tours, Inc. v. ICC, 735 F.2d 591, 596 (D.C.Cir.1984) (when Congress has not delegated the function of supplying the meaning of a statutory standard to the agency, court must undertake full interpretive responsibility; agency view is relevant, but not controlling principle).
 
 
 64
 If we were to adopt the ICC's construction of section 10922(c)(2)(B), the ICC would effectively have the power to draw the boundaries of its own authority to regulate the bus industry. Such a construction of section 10922(c)(2)(B) would be tantamount to complete preemption of state regulatory authority over intrastate routes which lie between points on the map on an interstate route over which the carrier has authority to operate. The legislative history clearly indicates that Congress did not intend to preempt the authority of the states to regulate intrastate bus service which is unrelated to interstate operations actually being conducted. The ICC's interpretation of section 10922(c)(2)(B) would accomplish exactly that: under the ICC's construction of the statute, a carrier could apply for and be granted operating authority over an interstate route between Los Angeles and New York City, and actually proceed to operate only a service between Los Angeles and Riverside, California. We refuse to countenance this type of an "end run" around the compromise negotiated in the Bus Act. See Trailways, Inc., 727 F.2d at 1292 (authority to operate a deviation route under Bus Act Sec. 7 is entirely parasitic on the underlying certified route; if rule were otherwise, carrier could take a certified route it no longer wants to serve, gain a certificate for a deviation route, and then cease service on the underlying certified route).
 
 
 65
 Accordingly, we conclude that the ICC abused its discretion by acting outside its statutory authority in granting the certificates of operating authority to Funbus and Lounge Cars.
 
 
 66
 V. REMAND TO THE ICC FOR FURTHER FACTUAL FINDINGS
 
 A. Funbus (Appeal No. 85-7104)
 
 67
 Because of the ICC's incorrect interpretation of section 10922(c)(2)(B), it failed to make specific factual findings concerning the nexus, if any, between the interstate services which Funbus actually operates and its intrastate services. The ICC has primary jurisdiction to determine whether operations conducted by an ICC-certified carrier are within the scope of its certificate. Service Storage & Transfer Co. v. Virginia, 359 U.S. 171, 177-78, 79 S.Ct. 714, 718-19, 3 L.Ed.2d 717 (1959) ("[I]nterpretations of federal certificates of this character should be made in the first instance by the authority issuing the certificate and upon whom the Congress has placed the responsibility of action."); accord Jones Motor Co. v. Pennsylvania Public Utility Commission, 361 U.S. 11, 805 S.Ct. 69, 4 L.Ed.2d 50 (1959). The primary jurisdiction doctrine is applicable when an action " 'requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body.' " United States v. Yellow Freight System, Inc., 762 F.2d 737, 739 (9th Cir.1985) (quoting United States v. Western Pacific Railroad, 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956)).
 
 
 68
 Resolution of the question whether the requisite nexus exists between a carrier's interstate operations actually being conducted and its intrastate services " 'raises issues of transportation policy which ought to be considered by the Commission in the interests of a uniform and expert administration of the regulatory scheme laid down by th[e] Act.' " Id. (quoting Western Pacific, 352 U.S. at 65, 77 S.Ct. at 166). We remand this matter to the ICC for further factual findings in light of our ruling that the ICC has authority to issue a certificate authorizing intrastate operations only where the intrastate operations are conducted as a part of existing interstate services.
 
 B. Lounge Car (Appeal No. 85-7105)
 
 69
 The effect of the ICC's legal error on its ability to make factual findings regarding the scope of a carrier's interstate route and its connection to the carrier's intrastate operations is underscored by the posture of the Lounge Car proceeding on this appeal. The ICC denied ASI's request for an evidentiary hearing concerning the scope of Lounge Cars' intended operations. The ICC ruled that such information was irrelevant to the question whether a carrier is entitled to operating authority over an intrastate route which is physically located on a road over which the carrier has interstate operating authority. The ICC's construction of section 10922(c)(2)(B) thus prevented it from making any factual findings regarding the relationship between Lounge Cars' interstate and intrastate operations.
 
 
 70
 The ICC's denial of ASI's request for an evidentiary hearing effectively deprived ASI of its statutory right to protest the issuance of an ICC certificate. Under 49 U.S.C. Sec. 10922(c)(2)(B), a person may object to the issuance of an ICC certificate by producing evidence which establishes that the issuance of the certificate would not be "consistent with the public interest." See also 49 C.F.R. Sec. 1160.90 (1985). ASI speculates that the issuance of the Lounge Car certificate might be inconsistent with the public interest because its ultimate result could be to reduce total service to the public; ASI asserts that it would be forced to reduce its service to the smaller communities which it currently serves in order to compensate for the predicted loss of revenues which it would suffer as a result of Lounge Car's entry into the airporter shuttle market. See 49 C.F.R. Sec. 1160.95(a)(4) (1985) (one factor to be considered in determining whether authorization to operate would be consistent with the public interest is whether operation would "impair the ability of any other motor common carrier of passengers to provide a substantial portion of the regular-route passenger service which such carrier provides over its entire regular-route system"); Vanguard Interstate Tours, 735 F.2d at 598 (public interest inquiry should focus upon whether a new competitor's entry into a particular market will adversely affect an existing carrier in the market in such a way that overall service to the public will be diminished).
 
 
 71
 Under the ICC's regulations, a request for an oral hearing on a protest will be granted only "where use of modified procedures [permitting a decision on written pleadings] would prejudice a party, material issues of decisional fact cannot adequately be resolved without an oral hearing, or assignment of an application for oral hearing is otherwise required by the public interest." 49 C.F.R. Sec. 1160.68(c) (1985). As ASI points out, the ICC's refusal to grant ASI's request for an oral hearing was prejudicial because ASI was precluded from obtaining the information necessary to exercise its statutory right to protest the issuance of the certificate.
 
 
 72
 The D.C. Circuit recently addressed this question in Cross-Sound Ferry Services, Inc. v. ICC, 738 F.2d 481 (D.C.Cir.1984). In Cross-Sound, the court held that the ICC acted unreasonably in refusing to permit Cross-Sound to unearth the information necessary to evaluate Cross-Sound's protest, and then in dismissing that protest as speculative. Id. at 487. The court reasoned that the ICC's failure to require specificity in routes prevented it from reaching a reasoned decision as to whether the proposed service would be in the public interest. Id. at 485-86. The court noted that the right to protest, and the burden to show that entry would not be in the public interest, presuppose the disclosure of the type of service which an applicant intends to provide. Id. at 485-86; see also Vanguard Interstate Tours, 735 F.2d at 598 ("existing carriers will be in the position to, and have the most motivation to, demonstrate the potential adverse effects of a new carrier's proposed service on a particular route").
 
 
 73
 We agree with the D.C. Circuit that the ICC's construction of the entry provisions of the Bus Act frustrates Congress' intent in enacting the statute. The fact that ASI failed to pursue an alternative means of gathering information--i.e., requesting discovery--does not alter the fact the ICC's failure to grant ASI's request for a hearing prevented the ICC from obtaining a full record and reaching a reasoned decision. Consequently, we reverse the ICC's decision in no. 85-7105 and remand the case to the ICC for an evidentiary hearing. The ICC is instructed to consider consolidating this case with the proceedings pending in Airport Services, Inc. v. Lounge Cars Tours Charter Co., ICC No. MC-C 10943.
 
 VI. DISTRICT COURT ACTION
 
 74
 In the district court action, Funbus sought a declaratory judgment stating that the ICC has primary jurisdiction to interpret the scope of its certificates of operating authority, an interpretation by the ICC of its certificate, and an injunction against the CPUC's cease and desist order. Subsequent to the entry of the district court's judgment dismissing the complaint, Funbus obtained all of the relief which it sought in the district court. The CPUC vacated its cease and desist order on June 20, 1984, and the ICC conducted the initial review of Funbus' certificate and issued an opinion interpreting it on December 28, 1984. Our disposition of the appeals taken from that decision reaffirms the validity of the principle that the ICC has primary jurisdiction to interpret the scope of operations conducted pursuant to a validly-issued certificate. Because the issues in the district court are thus no longer live and the parties now lack a legally cognizable interest in the outcome of this case, the appeal from the district court's order is moot. See Lee v. Schmidt-Wenzel, 766 F.2d 1387, 1389 (9th Cir.1985) (quoting Murphy v. Hunt, 455 U.S. 478, 481, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982)).
 
 
 75
 The ICC argues that these appeals are not moot because they fall within the "capable of repetition, yet evading review" exception to the mootness doctrine. This exception is applicable, however, only in exceptional situations where the plaintiff can show that he will again be subject to the same injury. Sample v. Johnson, 771 F.2d 1335, 1339 (9th Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 1206, 89 L.Ed.2d 319 (1986) (citing City of Los Angeles v. Lyons, 461 U.S. 95, 108, 103 S.Ct. 1660, 1668, 75 L.Ed.2d 675 (1983)). That other persons may litigate a similar claim does not save a case from mootness. Id. The plaintiff has the burden to show the likelihood of recurrence. Id. at 1342-43. Funbus and the ICC have failed to carry that burden in the instant case.
 
 
 76
 The Supreme Court has held and we have reiterated here that the ICC has the primary jurisdiction to review and interpret the scope of operating authority granted by its certificates. Our remand of appeal nos. 85-7104 and 85-7105 to the ICC for further factual findings and our holding that the ICC exceeded its jurisdictional grant under section 10922(c)(2)(B) by failing to require a showing of a nexus between intrastate operations and actual interstate operations dispose of the issues raised in appeals nos. 84-6170 and 84-6171. We decline to speculate as to the CPUC's likely conduct on the remand of appeal no. 85-7104; any questions which might be raised thereby are not yet ripe for review.
 
 
 77
 We thus follow the Supreme Court's established practice in dealing with a civil case from a court in the federal system which "has become moot while on its way here or pending our decision on the merits": we dismiss the appeal as moot, vacate the judgment below and remand with a direction to dismiss the complaint. United States v. Munsingwear, Inc., 340 U.S. 36, 39, 71 S.Ct. 104, 106, 95 L.Ed. 36 (1950); Enrico's, Inc. v. Rice, 730 F.2d 1250, 1255 (9th Cir.1984).VII. CONCLUSION
 
 
 78
 The ICC's rulings in appeal nos. 85-7104 and 85-7105 are reversed and the cases are remanded for further factual findings concerning the relationship, if any, between the intrastate services provided by Funbus and Lounge Cars and their interstate operations.
 
 
 79
 The appeals from the district court's rulings in appeal nos. 84-6170 and 84-6171 are dismissed as moot. The district court's orders are vacated and the case is remanded with a direction to dismiss the complaint.
 
 
 80
 KENNEDY, Circuit Judge, concurring in part and dissenting in part:
 
 
 81
 In my view, the words of the statute support the Commission's findings rather than the principal holding of my colleagues. With all respect, I dissent from the holding that the Commission had no authority to grant the intrastate certificates based on the underlying interstate routes.
 
 
 82
 The Bus Act permits the Commission to grant a certificate to a motor common carrier of passengers if the carrier's "intrastate transportation is to be provided on a route over which the carrier has authority ... to provide interstate transportation of passengers." 49 U.S.C. Sec. 10922(c)(2)(A). The statute sustains the Commission's interpretation, for the only word that links intrastate transportation and interstate transportation is "route." The majority's holding refines the statutory scheme considerably, and, I suggest, quite impermissibly, by substituting a different concept. The majority holds that there must be a demonstrated connection between intrastate "services" and preexisting or simultaneously approved interstate "services." At other points in the opinion, in lieu of the word "services," the majority uses the term "operations." The terms "route," on the one hand, and "services" or "operations" on the other, are not correlatives, as a matter either of ordinary semantics or motor carrier regulation. The court's importation of the concept of services and operations into a statute in which the key term is "route" seems contradicted both by the plain language of the statute and the analytic structure of the Act as a whole.
 
 
 83
 The statute provides for an intrastate certificate where the carrier "has been granted authority" or "will be granted authority" to provide interstate transportation over a route. 49 U.S.C. Sec. 10922(c)(2)(B). This grant of plenary authority is quite different from the mere conduct of operations. Indeed, there is no evidence that Congress intended to define a route differently for intrastate and interstate purposes. Under the majority's test, the Commission must depart substantially from the clear statutory scheme to make a finding that the intrastate services are somehow connected to the interstate services. There is so little guidance in the statute for the majority's mandated equivalency that the court returns the case to the Commission to articulate new standards. It is doubtful the Commission can do so without reaching far beyond the statute.
 
 
 84
 The Act's entry and exit provisions demonstrate the analytic problems the majority creates by equating "operations" or "services" with "routes." The entry provisions impose no requirement upon a carrier to begin full operations immediately over all authorized intrastate and interstate routes upon obtaining authority from the Commission. See 49 U.S.C. Sec. 10922(c)(2)(A), (B). Similarly, the Commission has authority to require a carrier to maintain intrastate services over intrastate routes while allowing it to cease its interstate operations over interstate routes. See 49 U.S.C. Sec. 10935(e)(3). These provisions require no connection between intrastate and interstate services, and it undermines the integrity of the Act to read into it the nexus the majority postulates. It is the concept of a route, not service, which is integral to the Act.
 
 
 85
 The majority is correct that the paradigmatic example used by congressional sponsors to explain the Act was the case where a route and services were coextensive, so that the same bus made local stops on an interstate journey. See, e.g., S.Rep. No. 411, 97th Cong., 2d Sess., reprinted in 1982 U.S.Code Cong. & Ad.News 2308, 2314-15. The example neatly fits the majority's test. But the language of the statute controls the statute's interpretation, not the principal example given to recommend its enactment. Even assuming that we should turn to legislative history for an explanation of the statute, an approach I reject given the statute's unambiguous terms, the point that emerges from the history is that carriers holding interstate certificates were impeded in their operations by severe regulatory costs and delays resulting from concurrent federal and state regulation, and that Congress intended to foster competition by removing a good deal of state jurisdiction and control. See, e.g., id. The words of the statute mirror that purpose; the holding of the majority does not.
 
 
 86
 In the case of the certificates here in question, local transportation was on a route or routes for which the carrier had authority from the Commission. The Commission issued a certificate to Funbus authorizing Funbus "to conduct regular-route transportation in intrastate, interstate, or foreign commerce at all intermediate points over twelve routes that form a network connecting points in Southern California and Las Vegas." Funbus Systems, Inc., ICC No. MC-C-10917, at 10-11 (Dec. 28, 1984). Funbus then began operating a bus service between Los Angeles International Airport, Buena Park, and Anaheim, all within the state of California. The Commission granted Lounge Car's application "to transport passengers in intrastate, interstate, and foreign commerce over nine routes ... [that] extend between Los Angeles, CA, or points in the vicinity, on the one hand, and, on the other, San Francisco, CA; San Ysidro, CA; Phoenix, AZ; and Las Vegas, NV." Lounge Car Tours Charter Company, Inc., ICC No. MC-153325 (Sub-No. 2), at 1 (Oct. 4, 1984). Lounge Car had been operating a regular-route bus operation between Los Angeles International Airport and Anaheim. While the parties objecting to the Commission's holding claim that the Lounge Car certificate in particular was a subterfuge to avoid state regulation, the facts in the record do not compel that inference. The ordinary processes and discretion of the agency are sufficient to ensure that it will not allow the integrity of the Act to be undermined in this regard.
 
 
 87
 I agree with the holding of the majority on all of the procedural aspects of this case, Parts I through III of the majority opinion, and the court's holding regarding mootness in Part VI of its opinion. I further agree, for the reasons given by the Commission, that the service here is not a special operation under 49 U.S.C. Sec. 10922(c)(2)(H), and that the incidental to air exception, 49 U.S.C. Sec. 10526(a)(8)(A), is not applicable. On the principal issue of the Commission's jurisdiction and authority to issue the intrastate certificates, I must tender this dissent.
 
 
 
 [1]
 The House debates concerned H.R. 3663, a predecessor bill which was ultimately rejected by the Senate, see 127 Cong.Rec. 27, 185-93 (1981); the Senate substituted a new bill which became the Bus Act. S.Rep. No. 411, 97th Cong., 2d Sess. 1, reprinted in 1982 U.S.Code Cong. & Ad.News 2308. The ICC and Funbus argue that references to the House Report are improper because H.R. 3663 was not ultimately enacted. We disagree. The Representatives' comments with respect to the entry provisions in H.R. 3663 are relevant because the operative language of section 10922(c)(2)(B) of the Bus Act mirrors that contained in H.R. 3663. See United States v. Enmons, 410 U.S. 396, 404-05 n. 14, 93 S.Ct. 1007, 1011-12 n. 14, 35 L.Ed.2d 379 (1973) (remarks of Representatives, particularly of sponsor, with respect to House bill which passed only in the House are relevant to an understanding of Act ultimately passed by different Congress where operative language of original bill was substantially carried forward into the Act); see also Hudson Transit Lines, 765 F.2d at 342-43 (citing House reports in support of its construction of Bus Act Sec. 6); Commissioner of Transportation of New York v. United States, 750 F.2d 163, 168 (2d Cir.1984) (citing House reports in support of its construction of 49 U.S.C. Sec. 11501(e)(2)), cert. denied, 471 U.S. 1015, 105 S.Ct. 2019, 85 L.Ed.2d 301 (1985); Trailways, Inc. v. ICC, 727 F.2d 1284, 1288 (D.C.Cir.1984) (citing House debates on H.R. 3663 in support of its construction of Bus Act Sec. 7). Therefore, reference to the House reports and debates pertaining to H.R. 3663 for guidance as to Congress' intent in enacting section 10922(c)(2)(B) is appropriate
 
 
 [2]
 As a statement by the bill's sponsor, Representative Anderson's interpretation of the ICC's role is entitled to great weight. Enmons, 410 U.S. at 404-05 n. 14, 93 S.Ct. at 1011-12 n. 14; National Woodwork Manufacturers Association v. NLRB, 386 U.S. 612, 640, 87 S.Ct. 1250, 1266, 18 L.Ed.2d 357 (1967); accord City of New York v. Train, 494 F.2d 1033, 1039 (D.C.Cir.1974), aff'd, 420 U.S. 35, 95 S.Ct. 839, 43 L.Ed.2d 1 (1975)